# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 16-871


STATE OF LOUISIANA

VERSUS

STORMY NICOLE COFER
AKA STORMY COFER


**\*\*\*\*\*\*\*\*\*\***


APPEAL FROM THE
NINTH JUDICIAL DISTRICT COURT
PARISH OF RAPIDES, NO. 317,937
HONORABLE MARY LAUVE DOGGETT, DISTRICT JUDGE


**\*\*\*\*\*\*\*\*\*\***


## ELIZABETH A. PICKETT
## JUDGE


**\*\*\*\*\*\*\*\*\*\***


Court composed of Ulysses Gene Thibodeaux, Chief Judge, Sylvia R. Cooks and Elizabeth A. Pickett, Judges.


**AFFIRMED WITH INSTRUCTIONS.**

**Edward Kelly Bauman**
**Louisiana Appellate Project**
**P. O. Box 1641**
**Lake Charles, LA   70602-1641**
**(337) 491-0570**
**COUNSEL FOR DEFENDANT- APPELLANT**
      **Stormy Nicole Cofer aka Stormy Cofer**

**Phillip Terrell, Jr.**
**District Attorney, Ninth Judicial District**
**W. T. Armitage, Jr.**
**Assistant District Attorney**
**P. O. Box 1472**
**Alexandria, LA   71309**
**(318) 473-6650**
**COUNSEL FOR APPELLEE**
      **State of Louisiana**

**Stormy Nicole Cofer**
**P. O. Box 26**
**St. Gabriel, LA   70712**
**PRO SE**

**PICKETT, Judge.**

<u>FACTS</u>

On October 21, 2013, the defendant, Stormy Nicole Cofer, shot a gun through the window of the vehicle in which she was a passenger. The shot struck and killed the victim, Keiunna Collins.

The defendant was charged with second degree murder, a violation of La.R.S. 14:30.1, on December 19, 2013. A jury found her guilty as charged on September 18, 2015. The trial court denied her motion for post-verdict judgment of acquittal and/or for new trial on September 28, 2015, and sentenced her to life in prison without benefit of parole, probation, or suspension of sentence. The trial court denied the defendant's motion to reconsider her sentence on January 25, 2016. The defendant now appeals, arguing that the evidence was insufficient to convict her because the state failed to carry its burden of proving that she had the specific intent to kill or inflict great bodily harm and that she did not act in self-defense; the trial court failed to adequately charge the jury; her counsel was ineffective; and her sentence is excessive.

<u>ASSIGNMENT OF ERROR</u>

The evidence herein is legally insufficient to sustain Stormy Cofer's conviction.

<u>PRO SE ASSIGNMENTS OF ERROR</u>

1. Appellant's Sixth and Fourteenth Amendments to the United States Constitution [sic] were violated because the evidence is legally insufficient to support the conviction of second degree murder, as the State failed to meet its burden.

2. The trial court violated the Appellant's U.S. Constitution Sixth Amendment due process rights in the failure to adequately charge the jury.

3.    Appellant's U.S. Constitution Sixth Amendment right to effective assistance of counsel was violated by trial counsel.

4.    Appellant's U.S. Constitution Eighth Amendment right to protection against cruel and excessive punishment were [sic] violated when the trial court failed to consider a downward departure from the mandatory sentence.

## ERRORS PATENT

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed by this court for errors patent on the face of the record. After reviewing the record, we find there is one error patent, and the court minutes of sentencing require correction.

The record before this court does not indicate that the trial court advised the defendant of the prescriptive period for filing post-conviction relief as required by La.Code Crim.P. art. 930.8. The trial court is directed to inform the defendant of the provisions of Article 930.8 by sending appropriate written notice to the defendant within ten days of the rendition of the opinion and to file written proof in the record that the defendant received the notice. *State v. Roe*, 05-116 (La.App. 3 Cir. 6/1/05), 903 So.2d 1265, *writ denied*, 05-1762 (La. 2/10/06), 924 So.2d 163.

The court minutes of sentencing also do not reflect that the defendant's life sentence was imposed at hard labor as indicated in the sentencing transcript. "[W]hen the minutes and the transcript conflict, the transcript prevails." *State v. Wommack*, 00-137, p. 4 (La.App. 3 Cir. 6/7/00), 770 So.2d 365, 369, *writ denied*, 00-2051 (La. 9/21/01), 797 So.2d 62.   The trial court is, therefore, ordered to correct the court minutes of sentencing to reflect that the defendant's sentence is to be served at hard labor.

## SUFFICIENCY OF THE EVIDENCE

The defendant argues that the evidence at trial was insufficient to support her conviction for second degree murder and insufficient to negate a claim of self-defense. Alternatively, she argues she should have been found guilty of the lesser offense of manslaughter.

The standard of review in a sufficiency of the evidence claim is "whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found proof beyond a reasonable doubt of each of the essential elements of the crime charged." *State v. Leger*, 05-11, p. 91 (La. 7/10/06), 936 So.2d 108, 170, *cert. denied*, 549 U.S. 1221, 127 S.Ct. 1279 (2007) (citing *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781 (1979), and *State v. Captville*, 448 So.2d 676 (La.1984)). The *Jackson* standard of review is now legislatively embodied in La.Code Crim.P. art. 821. It does not allow the appellate court "to substitute its own appreciation of the evidence for that of the fact-finder." *State v. Pigford*, 05-477, p. 6 (La. 2/22/06), 922 So.2d 517, 521 (citing *State v. Robertson*, 96-1048 (La. 10/4/96), 680 So.2d 1165, and *State v. Lubrano*, 563 So.2d 847 (La.1990)). The appellate court's function is not to assess the credibility of witnesses or to reweigh the evidence. *State v. Smith*, 94-3116 (La. 10/16/95), 661 So.2d 442.

The factfinder's role is to weigh the credibility of witnesses. *State v. Ryan*, 07-504 (La.App. 3 Cir. 11/7/07), 969 So.2d 1268. Thus, other than insuring the sufficiency evaluation standard of *Jackson*, "the appellate court should not second-guess the credibility determination of the trier of fact," but rather, it should defer to the rational credibility and evidentiary determinations of the jury. *Id.* at

1270 (quoting *State v. Lambert*, 97-64, pp. 4-5 (La.App. 3 Cir. 9/30/98), 720 So.2d 724, 726-27).  Our supreme court has stated:

> However, an appellate court may impinge on the fact finder's discretion and its role in determining the credibility of witnesses "only to the extent necessary to guarantee the fundamental due process of law."  *State v. Mussall*, 523 So.2d 1305, 1310 (La.1988).  In determining the sufficiency of the evidence supporting a conviction, an appellate court must preserve "'the factfinder's role as weigher of the evidence' by reviewing 'all of the evidence . . . in the light most favorable to the prosecution.'" *McDaniel v. Brown*, 558 U.S. ___, ___, 130 S.Ct. 665, 674, 175 L.Ed.2d 582 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979)).  When so viewed by an appellate court, the relevant question is whether, on the evidence presented at trial, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319, 99 S.Ct. at 2789.

*State v. Strother*, 09-2357, pp. 10-11 (La. 10/22/10), 49 So.3d 372, 378.

"Second degree murder is the killing of a human being" with the "specific intent to kill or to inflict great bodily harm[.]"  La.R.S. 14:30.1(A)(1).  "Specific criminal intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act."  La.R.S. 14:10(1).  "Firing into a crowd is sufficient to establish specific intent to kill."  *State v. Williams*, 13-497, p. 10 (La.App. 3 Cir. 11/6/13), 124 So.3d 1236, 1243, *writ denied*, 13-2774 (La. 5/16/14), 139 So.3d 1024.

> [I]n a case in which defendant asserts that he acted in self-defense, the state has the burden of establishing beyond a reasonable doubt that he did not act in self-defense. *State v. Brown*, 414 So.2d 726, 728 (La.1982). When defendant challenges the sufficiency of the evidence in such a case, the question becomes whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found beyond a reasonable doubt that the homicide was not committed in self-defense.

*State ex rel. D.P.B.*, 02-1742, p. 5 (La. 5/20/03), 846 So.2d 753, 756-57 (footnote omitted).

4

Louisiana Revised Statutes 14:20(A) states, in pertinent part:

A homicide is justifiable:

(1) When committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger.

. . . .

(3) When committed against a person whom one reasonably believes . . . is attempting to use any unlawful force against a person present in a motor vehicle . . . .

(4) (a)When committed by a person lawfully inside . . . a motor vehicle . . . when the conflict began, against a person who is attempting to make an unlawful entry into the . . . motor vehicle . . . and the person committing the homicide reasonably believes that the use of deadly force is necessary to prevent the entry or to compel the intruder to leave the . . . motor vehicle.

In *State v. Fox*, 15-692, p. 4 (La.App. 3 Cir. 2/3/16), 184 So.3d 886, 890, *writ denied*, 16-404 (La.3/13/17), ___ So.3d ___, this court stated:

"In examining a self-defense claim, it is necessary to consider: (1) whether the defendant reasonably believed that he was in imminent danger of death or great bodily harm; (2) whether the killing was necessary to prevent that death or great bodily harm; and (3) whether the defendant was the aggressor in the conflict." *State v. Mayes*, 14-683, pp. 2-3 (La.App. 3 Cir. 12/23/14), 154 So.3d 1257, 1259, *writs denied*, 15-178, 15-220 (La.11/16/15), 184 So.3d 24. Additionally, in determining whether the defendant had a reasonable belief that the killing was necessary, it is appropriate to consider "the excitement and confusion of the situation, the possibility of using force or violence short of killing, and the defendant's knowledge of the assailant's bad character." *State v. Thomas*, 43,100, p. 5 (La.App. 2 Cir. 4/30/08), 981 So.2d 850, 854, *writ denied*, 08-1276 (La.2/6/09), 999 So.2d 769.

"Manslaughter is [a] homicide which would be [first or second degree murder], but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection." La.R.S. 14:31(A)(1). "'Sudden passion' and

5

'heat of blood' are not elements of the offense of manslaughter; rather they are factors which serve to mitigate murder to manslaughter." *State v. Vercher*, 14-1211, p. 10 (La.App. 3 Cir. 5/6/15), 162 So.3d 740, 746, *writ denied*, 15-1124 (La. 5/20/16), 191 So.3d 1065. The defendant must prove these mitigating factors by a preponderance of the evidence. *State v. Guillory*, 16-237 (La.App. 3 Cir. 11/2/16), 206 So.3d 1153.

Many witnesses testified at trial. Some, including the defendant, established the victim as the aggressor at the time of the shooting, while others portrayed the defendant as gunning down the victim.

*Henrika Bruins*

Henrika Bruins testified she "was side by side with Keiunna" and "witnessed [the defendant] taking Keiunna's life." Bruins testified that she, Keiunna, Shakay Holmes, and another female were going to a store. As they crossed the street, "a gray like old school car" rounded a corner. As soon as the victim said, "there goes Stormy," the defendant "leaned over the middle console through the driver's side and shot one time." The defendant was in the passenger's seat. Bruins said the victim "just stumbled over and she fell."

According to Bruins, prior to the shooting, the women were walking "just side by side, just singing a song." The victim did not attempt to get into the vehicle, and she was ten to fifteen feet from the driver's side when she was shot. The victim had nothing in her hands when she was shot. Bruins identified the defendant as the shooter at trial.

On the night of the shooting, Bruins gave a statement to police saying the group was "talking noise," which she explained was "[l]ike talking trash," in a confrontational manner. At trial, she said they were "talking noise amongst each

6

other. We wasn't [sic] talking noise to [the defendant]." She testified no conversation took place between Bruins and anyone in the vehicle, which was going "no faster than ten miles per hour" and "never came to a complete stop" after the shooting.

*Shakay Holmes*

The victim went to Holmes's residence around 3:00 p.m. on the day of the shooting. Holmes said she and the victim had a conversation about a fight involving the defendant earlier in the day. The victim was dating someone the defendant previously dated, and that was why the two did not get along.

Holmes and the victim then went to B. Love's house on Harris Street to "hang out." Holmes said they had no plan to fight with anyone, but the victim was getting calls from the defendant. Holmes and the victim sat in the car until Holmes got out to walk to the nearby store. The victim and two other girls walked behind her.

Holmes testified that as the victim walked across the street behind Holmes, "the car pulled out and stopped her from walking," between the victim and Holmes. "[T]he car stopped and everybody just looked at the car." Holmes saw the defendant on the passenger side. As the victim started to go around the car, the defendant shot her. She said the victim had no weapon and was "maybe a foot or two away" from the car; she did not touch or kick the car or pull on the door handle. The defendant leaned across the driver and shot out the window, pointing the gun toward the victim. The vehicle came to a complete stop and then left the scene. Holmes never heard the victim say the defendant was in the car. According to Holmes, the victim did nothing to incite the shooting. No one in the street blocked the vehicle so that it could not move. After the victim was shot, Holmes

7

saw "she had a box cutter and mace[.]" Holmes "never knew she had it on her though." The items were in the victim's bra; she had nothing in her hands when she was shot.

At trial, defense counsel questioned Holmes about a prior incident caught on video about a month and a half before the shooting. Holmes and the victim were in a car smoking marijuana when the defendant pulled her car in front of them. The victim said they would go to the defendant's house and "beat her up." They followed the defendant to her house, where the victim asked the defendant to fight her in the street. The defendant did not fight the victim. Holmes did not know the defendant before that day.

Holmes reviewed the video submitted as Exhibit D-1 and confirmed the video accurately depicted what they did that day. It was uploaded to Instagram. Holmes was not sure if it was also posted on Facebook. Those shown in the video were following the defendant because she had been driving a vehicle that was coming toward the victim's vehicle. The victim's vehicle, in which Holmes was a passenger, "had to brake and . . . make a quick move before [it] wrecked." The victim then decided to follow the defendant to her house. Holmes identified the victim as the individual standing in the street in the video.

*LaQuandra Baxter*

Baxter was a friend of the defendant, "[m]ore like a sister." On the day of the shooting, Baxter was walking toward the store when she saw the victim get shot and "fall on the parking lot." Baxter saw the defendant in the car with the gun. She said she did not see the victim try to open the vehicle's door or shout at anyone in it. However, two females with the victim were shouting toward the vehicle, "hoorahing it on[.]" Baxter saw the defendant shoot the victim.

*Tesla Foots*

Tesla Foots testified she was jogging on the Lee Street sidewalk at the time of the shooting. The victim was on Foots's left side when she was hit by a shot that "came from an old school gray car." The victim was not touching the car, trying to get in it, yelling or screaming. Foots did not know the victim; they were crossing the street at the same time. Foots held the victim as she died. According to Foots, the car was moving when the shot was fired, and it never stopped.

*China Gold*

China Gold said that she met up with the defendant at the home of Jernisha Jenkins about an hour before the shooting occurred.[1] The defendant picked them up, and they went to the defendant's house for the defendant to get ready for school. Gold first testified Bruins and a group of other girls in a black Charger, a gray Charger, and a gray Honda passed by the defendant's house and called her "a b-i-t-c-h" and other names. However, Gold later said she "didn't hear nobody say nothing [sic]." The cars "just passed by speeding and they turned out." The cars were on a side street two houses down from the defendant's house, and they passed without honking.

Around 5:00 p.m., Gold, her baby, Jenkins, Jenkins's cousin, the defendant, and the driver of the vehicle (Gold did not know his name) left the defendant's house on Van Street in an older model gray or silver Impala. Gold was seated behind the defendant on the passenger's side. The group planned to pick up another person in Pecan Grove, and then the defendant was going to school. They had no plans to fight anyone.

---

[1]The record also shows Gold referring to Jenkins as "Joleesha."

When they turned onto Dallas Street, they saw "Keiunna Collins and them" walking across Lee Street. Jenkins told the driver to turn left because it was faster to get to Pecan Grove. The defendant "said go to the right so she could stop from seeing all the people that was walking across the street." Gold said the group walked in front of the stopped car; "[i]f the car would have kept going, they would have got hit." Bruins "was in front of the car telling [the defendant] to get out [of] the car. Gold said she heard Bruins say "the B word[.]" Bruins "stopped like she was going on [the defendant's] side of the car." Gold said Bruins "was like, get out the car. Let's fight. Bitch, get out the car." The victim was a few steps away from the driver's side.

Gold said Bruins was lying if she said she was singing and never got in front of the car. Gold also described what the victim did as: "You know how you like you walk away – hype – like she wanted to fight. Like she was like, come on let's fight. Like basically telling her to get out of the car" with hand motions. The victim was "walking with fury[.]" She never hit the car or tried to open its door. She had no backpack, knife, or anything in her hands. She came no closer than four feet from the car.

With the car stopped, the driver of the vehicle leaned back in his seat, and the defendant "came up with the gun and she shot [the victim]." Gold saw the gun in the defendant's hand, and she saw her shoot through the lowered window.

The victim was on the side of the car by the driver's door.

The driver "took off" after the shooting. He put them out of the car on another street. "[The defendant] went her way," and Jenkins's grandfather took the rest of the group to the police station.

Before the defendant, Gold, and the rest of the group left the defendant's house prior to the shooting, Gold said she saw the never saw the defendant or the driver with a gun. Rather, Gold saw a man named Alfred King "come through the backyard with a black gun and he went in the house and ain't [sic] see him no [sic] more." Gold and Jenkins were outside, and the defendant was inside. Gold thought Norris, who later drove the car when the victim was shot, was also inside.

*Jernisha Jenkins*

Jenkins and the defendant were close friends. She had also known the victim for about a year, and she said they "had just started being close around the time everything had happened." However, she also testified that they were close enough friends that the victim lived with her. She testified that the defendant and the victim had a history of disagreements involving Timothy "Iceberg" Ricard, a man who was the defendant's "baby daddy" and who was also seeing the victim.

The first altercation between the victim and the defendant occurred when Jenkins, the victim, and Ricard were together. The defendant drove up and spoke to Jenkins. Ricard had previously sent a text to the defendant saying, "don't be mad when you see me with my new bitch that's your friend." Jenkins told the defendant she was not Ricard's new girlfriend; she never told her the new girlfriend was the victim. Jenkins and the victim next went to the King City store. The defendant came in, and she and the victim "bumped each other." According to Jenkins, "[f]rom then on it was just beef with them two."

At one point, the victim came home while Jenkins was on the phone with the defendant. Jenkins told the victim the defendant "said she didn't have nothing [sic] against her and she ain't want [sic] to fight her." Jenkins further described the conversation:

11

And that Iceberg still was texting her stuff. And [the victim] said she wanted to talk to [the defendant] woman to woman. So we went met [the defendant] across the tracks – me, [the victim,] and this boy named Taz. And they went in the alley and they talked. And they talked for about ten minutes. They was [sic] standing over there just them two. And then [Jenkins] walked over there to go make sure everything was alright. And it was good. They – she showed the text messages, you know, where Iceberg was telling her. [The victim] showed her the stuff he was telling her and they came to a conclusion that he was a liar and was trying to play both of them.

Jenkins described another occasion where she and the victim were in a car, and they met up with the defendant at a gas station. The defendant "started yelling. And [the victim] started saying something." The victim's vehicle was behind the defendant's vehicle, but the defendant made a u-turn and drove away. At another time, the victim and Holmes came to the defendant's house, took her phone, and went through it. According to Jenkins, "it was resolved after that again." Jenkins and the victim "fell out" because the victim thought Jenkins "was going back telling [the defendant] stuff from what Iceberg I was telling her I was supposed to be saying . . . . Everyone was arguing and text messages and over the phone."

The victim came to Jenkins's house one day with "some girls." Jenkins "called the police [']cause [she] figured they was [sic] going to try to jump [her]." A police officer talked to the victim on the phone and asked her not to come back to the house.

Jenkins testified that, on the day of the shooting, the defendant picked up Jenkins in Norris's gray car around 2:00 p.m. While they were driving around, they met the victim, with Ricard in the car with her, on Harris Street. "And they was like this about to wreck. So [the defendant] swung the wheel and she like hit the curb." She said the victim's vehicle was on the wrong side of the road, causing the defendant to "almost wreck."

Shortly after, around 2:30 p.m., the victim and the defendant met again in their vehicles. They stopped "window to window." The defendant "just was like, you wanna [sic] fight? Let's fight. And they both just jumped out the car and they started fighting." The defendant grabbed a bat in the car after the victim "got in the car and was trying to bust the windows out the car[]"; she did not originally have the chance to get the bat because Jenkins had grabbed it. The victim had no weapon.

Jenkins said that the defendant and the victim exchanged blows in the street, with the victim slinging the defendant on the ground and biting her, until Jenkins and Gold broke up the fight and the victim got in her own car and left. At some point, Jenkins had heard the defendant say, "if they pull back up in front of my door, I'm going to shoot the car up." The record is not clear about when the defendant made the comment.

The defendant and Jenkins returned to the defendant's home after the fight, then Jenkins left. While Jenkins was parked at a fast food restaurant, she saw the victim, Bruins, and another individual at the corner in three separate cars. Jenkins returned to the defendant's house and found her arguing on the phone with the victim. The defendant had a gun in her hand as she paced back and forth outside "[t]o the corner and back to the house." Jenkins was told Alfred King brought the gun to Defendant.

The defendant had the gun "in her hand, shaking it and stuff," while she was arguing with the victim. Norris took the gun from the defendant, "and he put it on safety and he put it in the car."

Jenkins, her niece, Gold, Norris, and the defendant got in the car to go pick up their friend at Pecan Grove. As the vehicle came down Lee Street, someone

with the victim's group of friends saw it and "yelled, there they go right there." When the vehicle turned the corner, "they had started walking fast and they had made to like the middle in between the two yellow lines that separate the lanes." They were not simply walking across the street to the store; they came running to the car. Bruins told the defendant, "bitch, get out the car." She said it "[a] lot of times."

She testified the victim never said anything. She stood right by the driver to the left of Bruins with her arms folded, waiting for the defendant to get out of the car. She kept her arms crossed the entire time, including when she was shot. The group, which she said included Tesla Foots, continued to try to get the defendant to get out of the car, and the defendant "just picked the gun up and she just shot it." She did not point it at the victim. Norris, the driver, "kept going[,] and [Jenkins] looked back" and saw Bruins still trying to stop the car, not knowing the victim had been shot. Jenkins testified two cars were in front of their vehicle prior to the shooting, and their vehicle could not move. However, "the cars had done passed by [sic]" at the time of the shooting, and Norris drove away. Jenkins never saw the victim attack anyone, touch the car, try to get in the car, have any kind of weapon on her, or pull on the door handle. The other girls were "trying to pump [the victim] up to come back and fight [the defendant]."

When Jenkins told the defendant the victim was shot, the defendant "started crying and shaking." The defendant had not really aimed the gun; she had just picked it up, "[a]nd she just shot." She did not point the gun at the victim Jenkins said, "[i]t just went off." She said if Bruins had not run up to the car, the incident may not have happened. In all the run-ins between the victim and the defendant, Jenkins said she never saw the victim with any type of weapon. Likewise, the

14

defendant did not usually arm herself with a gun when she and her friends went to Pecan Grove. Jenkins said the defendant did not arm herself on the day of the shooting. She had the gun while she was arguing with the victim on the phone, "shaking it and stuff."

*William Norris*

Norris was charged with conspiracy to commit second degree murder as a result of this incident. He waived his Fifth Amendment rights and testified the state told him it "might consider something" if he "confess[ed] truthfully," but it never offered him a deal in return for any testimony.

The defendant and Norris were in a "[b]oyfriend, girlfriend" relationship at the time of the incident. Norris thought problems between the defendant and the victim began "a month or two before the shooting."

Norris had bought the gun, a .45 caliber Highpoint, after he was robbed. He almost always kept it in his car. He gave it to the defendant when she told him someone broke into her house about a month before the shooting. She kept it about two weeks before Norris got it back.

On the morning of the shooting, the defendant asked to use Norris's car. When she returned home, she said she and the victim "ran into each other or whatever and she said they were gonna [sic] go fight." He and the defendant went to Ricard's house and found the victim nearby. The defendant and the victim fought. Norris thought the defendant grabbed a bat, but one of the girls with them took it from her. Norris and "everybody else" grabbed the defendant, put her in the car, and returned to the defendant's house. He did not see the victim with any kind of weapon.

The defendant and the victim then "ended up on the phone and they got to arguing over the phone." Norris was sitting in his car when the defendant asked him for his gun "[c]ause the girl said she gonna [sic] kill her." The gun was in Norris's car under the seat. The defendant was walking around, still on the phone with the victim, telling her not to come to the defendant's house. Norris did not recall the defendant saying she would shoot the victim or her car, but he was not paying attention. Norris was in his car, "messing with [his] radio," while the defendant "was walking up and down the street, like back and forth, like you know how you are back and forth up and down the street. She was just pacing basically."

Norris did not believe the victim told the defendant she was going to kill her, so the defendant turned on her phone's speaker. When the victim said she would kill the defendant, he gave the defendant the gun. After the defendant went inside, Norris saw the victim and "some other girls" ride by in their car on a side street by the defendant's house, and defendant came back outside. She "jumped back on the phone" to call the victim. Norris tried to calm her and told her twice to put the gun in the house. He thought she did what he asked, and he "didn't even check her or look" before they "rolled out." The defendant did not return the gun to Norris. The defendant, Jenkins, Gold, and a baby got in the car with Norris to go pick up a friend from work. When they reached the corner of Lee and Van, the defendant told him to turn left because she "just want[ed] to see something[.]" He then turned right onto Dallas Street and saw the victim, who "hurried up and started walking real fast" when she saw his car. Norris testified regarding the events that followed:

16

You know, when she seen [sic] the car, she hurried up and walked into the middle of the street to block me from moving and I pulled up on her. I was, I was hitting the horn telling her to move out the way, get out of my way, this, that and the other. She wouldn't move so I slowed down but I didn't stop and I didn't want to run her over so I just went slowly. I nudged her with the car and she was like, Oh you gonna [sic] hit me huh? You gonna [sic] hit me and then she eventually moved and she come [sic] round the side and looked like she was (interrupted)

. . . .

Q. Let me, let me ask you this. What was her stance? Was she – did she run over there?

A. Like into the street?

Q. Yeah.

A. She – I don't want to say she ran, she walked faster than what she was walking. She moved faster than whatever, however she was walking 'cause you know she was mad. You know, and so she hurried up and not just ran, but kind of jogged maybe and got in the street and stood there like this here.

Q. Okay and then when you finally nudged her and she moved around the car, which side did she go on?

A. The driver's side.

Q. Okay and then what happened?

A. You know, she got to saying, Are you, are you going to hit me. I said, Get the F out the way and she like, you know, I seen [sic] her look at my, you know, like she look [sic] down, like she was fixin' to grab the door or whatever and that's why I hit my lock and I hit the gas to make it just jump to get away from her and the same time,[] whoever her friend was that was walking with her, kinda pulled her, I guess so – thinking I was gonna [sic] run her feet over or something. She kinda pulled her so she couldn't get to my handle. She couldn't get to it, you know, but, uh, but when she got by my trunk, she kicked my trunk, hit my trunk, and me and her, I was like, Yeah, get the fuck off. Quit hitting my car, this, that, and the other. By the time I turned around, that's when I see [the defendant] reaching out the window.

Norris said that the defendant was waving the pistol in a manner that "was unorthodox, she wasn't holding. She wasn't focused with it, you know."

17

At some point, Norris said he could see down the gun barrel, and he moved out of the way. He told her to stop, but by the time he said that, the defendant "was already in the motion." The defendant reached across him, placing the gun in the opening in the window, and the gun "went off." Norris had "moved [his] head so she wouldn't blow [his] face off." Norris's car had passed the victim by that point. Norris said he knew the defendant

> didn't try to do what she did 'cause after the gun went off, after we got down the street and I looked at her she had that blank look on her face like, you know, – then once the girls told her that she shot her, she – like she seen [sic] a ghost.

After Norris looked in his rearview mirror and saw the victim fall, he knew she had been shot. He pulled over at the next street, all the passengers jumped out, and he "took off." The defendant did not return the gun to him; he never saw it again.

Norris drove to the home of a cousin, who was not home. He called another cousin, who took him to his mother's house. Norris's mother called the police and told them he had something to do with the shooting.

Later in Norris's testimony, he said the victim stood in front of the car in a taunting manner and then came to the side of the car and said, "[g]et out the car." The defendant never asked him to let her out of the car. She said, "[g]et away from the car, [f]uck you – nothing extra. Nothing threatening." He said the entire block was lined with people. Only the victim stopped in front of the car. "She wanted to fight."

About a month before the shooting, Norris, the defendant, the defendant's two children, and another girl were "just riding around," and the victim followed them in her car for "a good 5 or 6 minutes." Norris and the defendant went home;

the victim followed them to the defendant's house, stood in the street and said "she was gonna [sic] beat her house." Norris identified a video shown to the jury as an accurate depiction of what happened the day the victim followed them. It showed the victim standing in the street, screaming and cursing at the defendant, who was standing in the driveway of her home. At one point, when the camera is pointing at the defendant, another female voice can be heard, saying, "she don't wanna [sic] fight." The victim had no weapon, and she did not enter the defendant's property. Someone with the victim took the video. Norris testified the encounter was calm at first, but "they" kept saying, "come to the street, come to the street, B come to the street." Norris told the defendant, "[d]on't go in the street or they gonna [sic] jump you[.]" The victim and the others eventually left "after talking a lot of stuff[.]"

*Jaime Davis*

Jaime Davis had been living at the defendant's house for a week and a half at the time of the shooting. She had run away from home. She was seventeen years old when she testified at trial. She did not know the victim or that she and the defendant did not get along.

On the day of the shooting, Davis and the defendant passed by Ricard's house and saw the victim in the yard and her car outside the house. The defendant "was mad. She was just mad." Later in the day, Davis witnessed a fight between the victim and the defendant. They were around the corner from the King Store; "[t]hey met up in cars and that's when they got out and started fighting." The defendant got a bat and tried to hit the victim's car, but the victim "pulled out too fast." Davis and the defendant returned to the defendant's house. Norris was driving the car. After the fight, the victim's "people . . . came to [the defendant's] house[,]" yelling out of the car windows.

Later, Davis saw a gun when Norris "pulled it from under his seat" after the defendant "asked for it." Davis later saw the defendant "[w]alking down the street on the phone with the gun in her hand." She heard the defendant "yell I was gonna [sic] kill that B." Davis did not know what the person on the phone with the defendant said. When the defendant and the others left the house, the defendant took the gun with her.

*Stormy Cofer*

The defendant waived her constitutional rights and elected to testify in her own defense. She said she first came to know of the victim about a month before the incident. As the defendant drove down Harris Street, she saw Jenkins, her good friend whom she had not seen for months. When the defendant stopped to talk to Jenkins, Ricard, the father of the defendant's son, pulled up behind her. The defendant left because she and Ricard were "having problems." Ricard then sent the defendant a text "that made [her] think that it was a relationship in between him and [Jenkins]." The defendant said she was hurt because Jenkins was her friend. The defendant returned to confront Jenkins. Jenkins explained she was not involved with Ricard, and the defendant "didn't care after that." The defendant saw the victim talking to Ricard before she left again.

On another occasion, about two and a half weeks before the shooting, the defendant said she was pumping gas at a store when she felt Ricard bump into her shoulder. When she looked up, she saw the victim leaning out of the window of a silver Honda. Ricard went into the store. When he came out, "he went straight to the car."

When the defendant tried to leave, the victim blocked her car. The defendant got out and told the victim to move her car. The victim "was like,

20

hitting the gas like she was going to tap the car." She backed up and allowed the defendant to leave, but she followed the defendant at least thirteen blocks to the defendant's godmother's house on a dead end street. The victim "drove across somebody's lawn, into a church parking lot, made a U-turn and came back across the lawn." "They" were "laughing and just yelling things out the window," and then they left. The defendant said she did not get out of the car or even stop.

The next confrontation was portrayed in the video. The defendant, her children, Norris, and defendant's friend Lilly were "just driving around that day[.]" A vehicle began following them; The defendant looked back and saw the victim.

After the victim followed them for about seven to nine minutes, the defendant drove home. The victim followed her there and "pulled up directly in front of the house." She and Holmes "hopped out of the car"; Holmes "was pumping up with [the victim]. She wasn't just standing there." The defendant described "pumping up" as "[s]he was like, you know, come out in the street. Come on."

At first the defendant was calm, saying she was not trying to fight. The victim had "a car load full of people" with her, "two guys in the front seat and two other girls in the backseat." The defendant said she "wasn't about to fight her because [she] felt like [she] would have got [sic] jumped." The defendant said she did not ask Norris for a gun or pull a gun on the victim.

The defendant went to school later that day. Her door frame was kicked in when she came home, but nothing was stolen.

The defendant called Jenkins to tell her about the damage to the door frame. She told Jenkins she thought the victim had done it. Jenkins "called [the victim] on three way and on the conversation, [the defendant] heard [the victim] say, yeah,

I came to that B house –[.]" The victim told Jenkins she went to the defendant's house with some other people and kicked in her door. Two weeks before the shooting, Jenkins "got [them] together." She called the defendant and said the victim "wanted to talk and she was being misled about things concerning the things that [Ricard] was telling her[.]" The defendant and the victim "had a conversation and everything was supposed to be over. Like everything was squashed." The victim explained she had a problem with the defendant "because of things that [Ricard] was saying." The victim thought the defendant was "a threat to their relationship …. She was actually nice. And [the defendant] thought everything was over." The day before the shooting, the defendant was driving down Harris Street toward her house when she saw the victim's car coming from the other direction. "[A]bout thirty or forty feet before [the victim] got to [the defendant], she swerved in [the defendant's] lane. And she was like coming dead at [the defendant] and she did not stop." The defendant "had to swerve off of the road and jump the curb to avoid hitting her car." The defendant saw nothing to obstruct the victim's car that would have caused her to swerve. The victim "kept going." The defendant "was stuck on the curb"; she "jumped off the curb and went home."

Around 3:30 or 4:00 p.m. the next day (the day of the shooting), the defendant and others were in her car when the victim "did the swerving thing again when [they] were passing each other up." Both vehicles turned around, and the defendant and the victim stopped with windows facing each other. The defendant "was like, okay I'm done. Like if you want to fight we gonna [sic] go ahead and fight. Get it over with." She did not ask Norris for a gun. She denied driving by Ricard's place and seeing the victim on the day of the shooting.

The defendant and the victim "jumped out [of] the car" and fought.     The defendant said she was "tired of the . . . threats, the taunts and the pulling up at [her] house. The following." If the victim wanted to fight "to get it over with," the defendant would do it. Jenkins, Davis, and Norris broke up the fight. When the victim went to her car, the defendant thought she was reaching for something, so she grabbed a bat. Jenkins took it from her; the victim "jumped back in the car and she drove off." The defendant and her friends went home. At that point, the confrontation was over for the defendant.

Jenkins left her phone at the defendant's house when she "went to go get her niece from daycare or somewhere." The defendant heard the phone "going off, going off, going off." The defendant answered it when she looked at it and saw the victim was calling. The victim said, "where is that B Stormy at?" The defendant told her she was at home. The victim told her to go outside because she was coming.

The defendant said she stepped outside, "heard a whole bunch of honking," and saw Bruins's car and a darker-colored car "going up the street. The defendant said she was still on the phone with the victim. The defendant said:

> She was just yelling a whole bunch of threats and saying she was about to come to the house. And then she bust out and said, alright, B, I'm gonna [sic] kill you. Go ahead and leave that house. I'm gonna [sic] kill you. So I ran outside. I said, Will [Norris] – I said, Will, she say [sic] she gonna [sic] kill me. He said, she not gonna [sic] do it. She just talking. And I said, man, she just said it.

When defendant put the victim on speaker phone so Norris could hear her, the victim said, "B, keep playing. Keep playing like you think I'm playing. You know how I'm coming. I'm telling you I'm gonna [sic] come round there. I got mine. I keep a strap. I keep a strap." The defendant testified a "strap" is "[a]

pistol." She "knew in [her] heart that it was a possibility that [Ricard] gave [the victim] that pistol." The defendant had known Ricard to carry "a .22 that was small enough to where you can conceal it in a mini pocket, purse or anything at least this small." The defendant said, "She told me that she was going to kill me. And she told me that she had a pistol." The victim had never before said anything about killing the defendant.

When the defendant heard this, she asked Norris for a gun. She "went to the car and [Norris] passed [her] the gun." She described it as "a big ole black gun. I was a hundred and thirty-five pounds. It was heavy for my arm. I barely could hold it up."

As the phone conversation continued, the defendant called the victim "a B" and said she would shoot her car if she came in front of the defendant's house. The defendant was pacing in the front yard with the gun. When the victim did not come back, the defendant hung up the phone. The victim kept calling while the defendant was getting ready to go to school at Unitech, where she studied to be a dental assistant. The defendant testified Davis was lying when she said the defendant said she was going to kill the victim.

The defendant went outside with her books, book bag, and the gun. She was returning the gun to Norris because she could not take it to school, and she did not want to leave it at home with her children. She laid the gun on the seat of Norris's car, but she did not know if he ever saw it.

The group left in Norris's car and turned left at the corner of Van and Lee. The defendant saw "a whole, whole bunch of people at the corner by Harris Street." She saw "somebody start pointing at the car." The group consisted of the victim, Bruins, Holmes "and a whole bunch of other girls. It was some guys too.

24

They stopped the car." They "jumped in front of the car" so that the car would have hit them if it had proceeded. A couple of people came to the passenger's side of the car.

The victim, Bruins, and another girl were on the driver's side of the car. "They were like, B, get out of the car. B, get out the car." The defendant said she heard someone kick at the car. She "heard pounding and [she] heard them telling [her], B get out of the car over and over." The victim ran to the driver's door; "she was about to reach for the door and she was going in her shirt. Like [the defendant] could see something bulging out her shirt[.]" The victim "had her arm across her chest like she was going in her shirt." The defendant could not see what the bulge was, and she never saw the victim armed with anything. If the victim had a gun, it would have had to be a small one.

The defendant said she thought the bulge was the .22 caliber handgun she had seen Richard carry in the past. The victim had told the defendant on the phone she had a gun, but the defendant had never seen her with one or any other type of weapon. The defendant said she saw "a bulge this big coming off her chest. [She] did believe that she had a gun on her and [she] did believe she was reaching for it to shoot [her]." She later "found out [the bulge] was not what [she] thought it was[,]" when Detective Hall told her at a hearing "it was a can of mace and a box cutter."

When the defendant saw the bulge, she said she picked up the pistol from the seat and began "just waving it just to try to scare them away from the car." She said she feared for her life and thought the victim was about to kill her. She "couldn't really hold [the gun] good" because it was heavy. She "didn't touch the safety[,]" and she "never cocked the gun." The defendant said she "was just trying

25

to get them to move back away from the car that was it.  All I know is it . . . just went off.  It just went off.  I don't know to this day . . . how that gun went off."  She was not aware the shot hit anyone.  She said she did not point the gun at anyone.  She was simply "trying to scare off everybody from around the car."  The defendant said she had never held, cocked, or shot a gun in her life.  Nor had she taken one off safety.

Norris's driver's side window was "at least halfway down."  If Norris had "put his hand out the window – not his arm, but just his hand out the window, he would have touched [the victim]."  After the shot, she said the victim "was still at the window . . . still like hyping."  The defendant asked to get out of the car, and she ran.  She threw the gun on the ground in the middle of the street and kept running.  The defendant said she knew if she had tried to return to the scene, "it would have been bad.  It wouldn't have been like I would have been able to help her.  They wouldn't have let me help her."

The defendant did not call the police, an ambulance or anyone else.  She contacted an attorney she knew and said she needed to turn herself in at the police station.  She was afraid the police "would think [she] was armed or something and try to do something."  The attorney offered to "put something together with the police and try to get [her] turned in."  She called the defendant and said they would go to the police station the next morning.  The detective, however, said he could not wait.  The defendant said she "wasn't ever able to get to the police station[,]" and she was arrested two days after the incident.

The defendant admitted she killed the victim, but she said she did not mean to do it.  She wanted the victim's father to know she would not have taken his

daughter away from him on purpose, and she asked for his forgiveness. She testified she did not try to kill the victim.

When asked about her family history, the defendant explained her mother "was strangled to death in a hotel room in Longview, Texas when [the defendant] was eighteen." Her father "was stabbed to death in jail." The defendant lived "in foster care for ten years."

At age fourteen, the defendant explained she witnessed a murder. She was in a car parked in front of a house with "somebody in [her] life that was like a brother to [her.]" She "just felt him push [her] down and all of a sudden [she] heard a whole bunch of popping." She did not want to talk further about the incident.

### Len Hall

Len Hall of the Alexandria Police Department was the detective on call at the time of the shooting. He took statements regarding the shooting from William Norris, Jernisha Jenkins, Tesla Foots, Maggie Harold, Holmes, and a juvenile. As a result of his investigation, he prepared an arrest warrant for the defendant.

An attorney contacted Detective Hall to make arrangements for the defendant to surrender herself. She requested "a certain amount of days," but Detective Hall could not grant the request because of the nature of the crime. The defendant did not turn herself in, and she was arrested two days later, on October 23, 2013. Police also arrested and charged four others with accessory after the fact, and they arrested and charged Norris with being a principal to second degree murder.

### William Bates

Lieutenant William Bates of the Alexandria Police Department found "a little bottle of pepper spray" at the scene of the shooting near two bloody shirts and debris left by the emergency medical personnel. He identified the clothing worn by the victim as sweatpants with no pockets, a tank top, a pair of tennis shoes, and a bra.

Lieutenant Bates also identified photographs he took of the car involved in the incident. A baseball bat was lying on the front passenger side floorboard. He found no shell casings in the car.

A plastic bag on the floorboard of the back passenger seat contained "a receipt from Academy where two different kinds of pepper spray was [sic] bought and the package for one of them was still inside it. The plastic package of it." The package was for the pepper spray brand PSC, the same brand as the bottle found at the scene. Lieutenant Bates found a second package for the pepper spray brand Sabre Pink, also on the Academy receipt, at the defendant's residence.

The bullet removed from the victim's right arm during the autopsy came from a .45 caliber semi-automatic Highpoint gun, a large, heavy, black firearm a little larger than a police duty weapon. As the crime scene investigator, Lieutenant Bates collected all the evidence in the case. He searched for a gun in the car and at the defendant's residence, but he never found it. He knew nothing about a box cutter, even though Detective Hall had testified at the defendant's bond reduction hearing the victim had a box cutter and mace in her bra. Lieutenant Bates testified at trial that Detective Hall would have been mistaken if he had said Lieutenant Bates told him a box cutter was on the scene.

*Kendrick Wright*

At the time of the shooting, Kendrick Wright worked for the City of Alexandria Fire Department. He responded to a call pertaining to a gun shot, and he was one of the first on the scene. When the victim's blouse and bra were cut open to administer medical care to her, "a blade like a utility knife," commonly known as a "box cutter," fell out of her bra. The box cutter would not have fallen from the victim's bra if medical personnel had not cut it.

*Dr. Joel Carney*

Dr. Joel Carney testified at trial as an expert in forensic pathology. He performed the autopsy on the victim and determined her cause of death was a gunshot wound to the chest. The bullet entered the victim's body on the lateral aspect of the left chest wall and entered the left chest between the sixth and seventh ribs. It passed through the left lower lung lobe, the heart, the right lung, and the right chest wall. The bullet exited the right chest wall and lodged in the right forearm. Dr. Carney referred to the bullet's entrance as "a distant range gunshot wound," which "usually means that the muzzle of the weapon was held at a distance greater than three feet from the skin's surface and that assumes a hand gun and no intermediate targets." The bullet passed almost straight through the victim's body from "a little bit behind" because "the exit wound was slightly toward the front of the body."

Toxicology tests on clots of blood from the victim's heart revealed the presence of alprazolam/Xanax, "an anti-anxiety and anti-depressant medication." The toxicology screen also revealed the presence of THC, the active ingredient of marijuana, and the presence of a breakdown product of THC.

*Analysis*

In *Fox*, 184 So.3d 886, the victim was the aggressor in the altercation that led to her death. She had a history of aggressive incidents and violent conflicts. However, the defendant admitted the victim hit the floor and was not moving before he began to choke her. Therefore, she was no longer a threat to the defendant once she hit the floor. Expert testimony established the victim's death was caused more by asphyxia than by blunt force trauma. This court found a reasonable trier of fact could have found choking the victim was "a disproportionate use of force that went beyond self-defense." *Id.* at 893. Further, the defendant concealed evidence, misled the victim's family about her whereabouts, and lied to police.

The victim had previously attacked the defendant in *State v. Soriano*, 15-1006 (La.App. 3 Cir. 6/1/16), 192 So.3d 899. The defendant testified the victim's friends brought the knife used to stab the victim, and he feared the victim would attack him again. The trial court found no reason the defendant could not have retreated from the situation instead of chasing the victim and stabbing him again. This court affirmed the defendant's manslaughter conviction and maximum sentence.

In the case before us, much of the evidence suggested the original, approximately month-long conflict between the defendant and the victim began with the victim. The evidence indicates the first "bump" at the store was initiated by either the victim or Ricard, who then followed the defendant in their vehicle. Subsequently, the victim followed the defendant, ran her vehicle into a curb, challenged her to fight in the street, and harassed her on the telephone.

Twice, the defendant thought the conflict was over, after they spoke about Ricard and again after their fight in the street. The victim, however, continued to

engage in aggressive acts toward the defendant. There was evidence that the victim told the defendant she stayed armed with a pistol, and she was going to kill her. The victim and her friends repeatedly drove by the defendant's house in their cars, honking and yelling.

The evidence further suggests that the defendant armed herself with a gun only after the victim said she would kill the defendant. The defendant said that when the group approached Norris's car, the defendant said she saw a bulge she thought could be a gun. She knew Ricard had a very small gun, and she thought the victim, his girlfriend, might have it in her blouse. The defendant further testified she thought the victim was reaching for the pistol when she grabbed the gun from the seat and waved it toward the group in the street. Evidence showed the victim in fact had a box cutter in her bra. These facts suggest a situation existed that could certainly justify the defendant's fear for her safety.

There was conflicting evidence regarding whether there was aggressive behavior toward the vehicle when the shooting occurred. Both Bruins and Holmes testified there was no aggressive behavior. Foots, who testified she knew neither the victim nor the defendant, testified that the victim made no move toward the car before she was shot. Baxter, who was friends with the defendant but not the victim, testified the people with the victim, but not the victim, were shouting something toward the car. She saw no one touch the car. The individuals inside the car all claimed the group of women that included the victim was acting aggressively. When evidence conflicts, it is a function of the jury to determine who is being truthful. *State v. Deselle*, 614 So.2d 276 (La.App. 3 Cir. 1993). This court cannot second guess that determination.

The defendant claims she picked up the gun in the car for the purpose of intimidation. She reasonably should have known of the level of danger her actions created. Holmes, the defendant's close friend, testified the defendant moved to the middle of the car's front seat to point the gun out the window. The defendant fled the scene and discarded the evidence of the gun. Although the defendant testified she tried to turn herself in the next day, she was actually arrested two days later. These were all intentional acts that suggest the defendant may have had the intent to cause the victim's death or great bodily harm.

The defendant had armed herself with the gun earlier in the day, when she paced in front of her house while arguing with the victim on the phone. Thus, she was familiar with the size and weight of the gun, and she knew how it felt in her hand. She had previously tried to use a baseball bat in a fight against the victim, but Jenkins had grabbed the bat away. Davis, the runaway who was staying with the defendant, testified that the defendant said she was going to kill the victim on the day of the shooting. The defendant herself admitted she said she would shoot the victim's car if the victim came to her house, an act which would endanger lives and escalate the conflict. While all the witnesses who were in the car testified they were either on their way to Pecan Grove or to take the defendant to school, they actually traveled right to where the victim and her group of friends were gathered. Only one witness, Norris, testified the victim touched the car, and his version implies that the victim kicked the trunk of his car after the car had passed the victim and immediately before the defendant fired the gun, which implies that the defendant fired the weapon at an impossible angle from inside the car. Not one of the remaining witnesses testified the victim touched the car. No person who testified saw the victim holding anything in her hands. Therefore, there is no

evidence that the victim had a weapon in her hands when the defendant shot her. Regardless of how much the victim had harassed the defendant or how aggressively she behaved at the scene, unless the defendant reasonably believed it necessary to kill her to prevent death or great bodily harm, the defendant was not justified in killing her. Expecting the victim to fight again was not sufficient to justify killing her. The defendant must have expected the victim to kill or cause great bodily harm.

The defendant also contends Dr. Carney's expert testimony showed the victim's arm was raised or she was reaching for something because of the trajectory of the bullet. No evidence was offered to suggest or support this theory. Jenkins, the defendant's close friend, testified the victim kept her arms crossed throughout the encounter, even when she was shot. This stance could have placed the victim's arm forward of the shot. Further, Dr. Carney testified the shot entered the victim's left side, passed through her body, and lodged in her right arm. Thus, the victim's left side was closest to the gun at the time it was fired. Had she been facing the car, as she most likely would have been had she been reaching toward it, she would not have been hit in the side. The defendant has simply not offered any evidence to show a reasonable probability the victim was reaching toward the vehicle or raising her arm to do anything that threatened the defendant.

Based on the evidence in the record, when viewing the evidence under the *Jackson* standard, the jury could have reasonably found the defendant killed the victim with the specific intent to inflict death or great bodily harm. Likewise, they could have reasonably found the homicide was not justifiable.

The defendant alternatively requests that this court vacate her conviction for second degree murder and enter a judgment for manslaughter. However, she offers

33

no support for this argument.  We consider her request abandoned for failure to state an argument regarding this issue.  Uniform Rules—Courts of Appeal, Rule 2-12.4(B)(4).

Accordingly, we find the defendant's argument that the evidence was insufficient to support the conviction lacks merit.

## JURY INSTRUCTIONS

The defendant claims her Sixth Amendment right to due process was violated because the trial court failed to adequately charge the jury.  The trial court read a charge to the jury that included the four possible verdicts of guilty of second degree murder, guilty of manslaughter, guilty of negligent homicide, and not guilty.  It defined each of the three crimes.

After the jury retired to deliberate, it sent questions to the trial judge asking for "a list of all charge options" and "a list of all definitions of all four possible verdicts."   The judge discussed the request with counsel and told them what he would read to the jury:

> BY THE COURT:  I'm just going to skip the top and I'm just going to start with Second Degree Murder.  Okay?  Second Degree Murder is.  Then I'm going to read Manslaughter is.  Then I'm going to read Negligent Homicide is. Then I'm going to read Justifiable Homicide. I'm going to read Justifiable Homicide in a motor vehicle and Aggressor Doctrine.  And then I'm going to stop at guilty as charged.
>
> BY [THE STATE'S COUNSEL]:     Alright.
>
> BY [DEFENDANT'S COUNSEL]:   Your Honor, you're going to stop at guilty as charged?
>
> BY THE COURT:  Yes.
>
> BY [DEFENDANT'S COUNSEL]:   Could you stop at responsive verdicts?
>
> BY THE COURT:  I'm not going to read guilty as charged.

BY [DEFENDANT'S COUNSEL]:  Oh, okay.

BY THE COURT:  I'm just going to read the elements of the different charges.  What was the cite?

BY [THE STATE'S COUNSEL]:  They asked for four.  Not guilty would be one of them.

BY THE COURT:  Right.  But then I have to read the – to get the not guilty – she may be not guilty because of self-defense.  So I would need to – or not guilty because of justifiable homicide.  So I have to read those to get to that.

BY [THE STATE'S COUNSEL]:  I understand that.  But I mean, not guilty as to one of those that she's – you're reading.

BY THE COURT:  Right.  Which I'm going to read the justifiable homicide in the – Second Degree Murder.  Any objections to me doing that?

BY [THE STATE'S COUNSEL]:  Not from us.

BY THE COURT:  Okay.  [Defendant's counsel]?

BY [DEFENDANT'S COUNSEL]:  No, Your Honor.

The trial judge then called the jury into the courtroom and reread the portion of the charge which defined second degree murder, specific criminal intent, manslaughter, negligent homicide, criminal negligence, justifiable homicide/self-defense, justifiable homicide while in a motor vehicle, and the aggressor doctrine. The trial judge explained how the jury must find the defendant not guilty if it found she killed in self-defense.  He also explained the jury must find the defendant not guilty if it found that the defendant

> was lawfully in the motor vehicle, that the person killed made or was attempting to make an entry into the motor vehicle, that the entry by that person was unlawful and forcible and that the defendant reasonably believed that the use of deadly force was necessary to prevent the entry or to compel the person to leave the motor vehicle[.]

35

He did not offer the jury a separate definition of "not guilty." He read to the jury what he told counsel he would read. Counsel had no objection when he told them what he would read or when he actually read it.

The defendant waived her right to raise an issue regarding the jury charge by failing to place an objection to what was read on the record. La.Code Crim.P. art. 841. The record shows the trial court originally instructed the jury that it could find the defendant not guilty. The jury was told how it could find the defendant not guilty when the charge was read and again when it was reread. The verdict sheet offered not guilty as an option. Contrary to the defendant's argument, "not guilty" was never removed as an option for the jury. The defendant's assignment of error lacks merit.

## INEFFECTIVE COUNSEL

The defendant argues trial counsel violated her Sixth Amendment right to effective legal assistance. The issue of ineffective counsel is more appropriately addressed in an application for post-conviction relief, where an evidentiary hearing can be conducted in the trial court. *State in the Interest of A.B.*, 09-870 (La.App. 3 Cir. 12/9/09), 25 So.3d 1012. However, where an ineffective assistance claim is raised on appeal, this court may address the merits of the claim if the record discloses sufficient evidence to rule on it. *Id.* If this court considers a claim of ineffective counsel on appeal, the defendant must satisfy a two-part test. He must first show that counsel's performance was deficient and then show that the deficiency prejudiced him. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052 (1984).

"[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant

36

must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* at 689.

The record before us here is sufficient to address the issues the defendant raises. The defendant's arguments more directly address the sufficiency of the evidence than ineffective assistance of counsel. An evidentiary hearing could not produce anything to support the defendant's arguments.

The defendant alleges ineffective assistance of counsel in the areas discussed below.

## *Failure to Investigate*

The defendant first alleges her counsel "failed to establish a method or conclusion of self-defense" by failing to call witnesses to support that theory and by failing to investigate. In support of her theory of self-defense, the defendant relies on the incident where the victim ran her off the road with her vehicle, the victim's trespass into the defendant's home when the victim took her phone, the victim's stalking of the defendant and placing the scene on social media, the victim's threat to kill the defendant, and the victim's statement "that she 'stays strapped.'"

Each of these incidents was addressed in detail at trial. The defendant suggests no additional witnesses and no additional evidence that should have been presented. She describes no additional investigation that should have been performed and no additional evidence that such an investigation would have produced. She also ignores the evidence which addressed in detail each incident she claims supports her theory of self-defense.

## *Crime Scene Reconstruction*

37

The defendant alleges a "crime scene reconstruction expert and sketches/drafts would have depicted an entirely different theory than that of the State." She contends the state adamantly failed to expose the presence of the box cutter and mace hidden in the victim's bra and failed to admit the victim's threats. She complains the investigating officers failed to report the box cutter and mace at the scene, and the individuals present at the scene were not sufficiently investigated. The defendant suggests she was denied a fair trial because counsel failed to obtain a crime scene reconstruction expert.

Additionally, the defendant argues an expert would have shown she did not discharge her weapon, and "there was not a straight, unevaded [sic] line of fire to hit the victim." No expert could have shown this. The weapon obviously discharged, and it traveled in a straight line to hit the first object in its path, i.e., the victim. While the defendant contends this was "a fairly questionable, if not an impossible shot," it obviously was not because it struck and killed the victim.

The evidence showed the victim had a box cutter in her bra when emergency medical personnel removed her clothes. While nothing showed the victim was also carrying mace, evidence showed a can of mace was found on the ground after the incident concluded. The defendant offers nothing to suggest additional evidence exists regarding the box cutter and mace that would have helped her defense. She offers nothing that more thorough investigation of the witnesses to the incident would have produced. Defense counsel (as well as the state) presented extensive evidence of the earlier encounters and the ongoing conflict between the victim and the defendant. The defendant has failed to show how the failure to retain a reconstruction expert rendered her counsel ineffective, prejudiced her in any manner, or resulted in an unfair trial.

*Failure to Argue Motions*

The defendant's counsel filed a post-verdict motion for judgment of acquittal/new trial that alleged insufficiency of the evidence and the State's failure to negate the defendant's theory of self-defense. The hearing of the motion and sentencing was September 28, 2015. Counsel elected to submit the motion without oral argument. The state elected not to submit a written or oral response. The trial court denied the motion.

Counsel also filed a motion to reconsider the defendant's statutory life sentence based on the trial court's failure to consider the mitigating factors of La.Code Crim.P. art. 894.1 and alleging the defendant's sentence was constitutionally excessive. At the hearing of the motion on January 25, 2016, counsel submitted the motion without oral argument.

The defendant incorrectly argues the state did not have to file a response because counsel did not present oral argument to the court on either motion. Counsel's extensive questioning of witnesses at trial shows his attempt to establish self-defense as the reason for the shooting and also his attempt to establish reasonable doubt through the evidence.

The defendant has not identified any argument her counsel could have stated that would have resulted in the motions being granted. She received a statutorily-mandated sentence of life imprisonment without benefit of parole, probation, or suspension of sentence. La.R.S. 14:30.1(B). She has submitted nothing to show her sentence is constitutionally excessive. Counsel's lack of oral argument at the hearing of the motions did not prevent the state from responding to the motions. Counsel was not ineffective for failing to make an oral argument at the hearings of the motions and did not fail to preserve any of the defendant's rights.

*Cumulative Effect*

The defendant argues the cumulative effect of her counsel's failures denied her right to a fair trial. The defendant's assignments of error regarding ineffective assistance of counsel lack merit. She has failed to show counsel was ineffective, and she has not satisfied the first prong of *Strickland*, 466 U.S. 668. Where individual assignments of error lack merit, no cumulative effect exists. *State ex rel. Busby v. Butler*, 538 So.2d 164 (La.1988).

The defendant's assignment of error regarding ineffective assistance of counsel lacks merit.

## EXCESSIVE SENTENCE

The defendant argues the trial court violated her Eighth Amendment rights against cruel and excessive punishment by failing to consider a downward departure from the mandatory life sentence. Her motion to reconsider her sentence argued the trial court should have referred to the sentencing guidelines of La.Code Crim.P. art. 894.1, and the sentence was constitutionally excessive.

> To justify a court's downward departure from a legislatively mandated sentence, a defendant must show he "is exceptional . . . because of unusual circumstances [he] is a victim of the legislature's failure to assign sentences that are meaningfully tailored to the culpability of the offender, the gravity of the offense, and the circumstances of the case." *State v. Johnson*, 97-1906, p. 8 (La.3/4/98), 709 So.2d 672, 676 (quoting Judge Plotkin's concurring opinion in *State v. Young*, 94-1636, pp. 5-6 (La.App. 4 Cir. 10/26/95), 663 So.2d 525, 531, *writ denied*, 95-3010 (La.3/22/96), 669 So.2d 1223).

*State v. Diggs*, 13-766, p. 8 (La.App. 3 Cir. 2/12/14), 154 So.3d 15, 20.

This court considered relative youth, romantic difficulties leading to a fatal shooting, and potential loss of possession of a pet in *State v. Jones*, 12-864 (La.App. 3 Cir. 2/6/13), 107 So.3d 861, *writs denied*, 13-516, 13-530 (La.

40

10/4/13), 122 So.3d 553. This court held these were not sufficient factors to justify a downward departure from a statutorily-mandated sentence.

Likewise, the defendant argued his history of mental illness and the prospect of deterring future criminal activity with treatment and medication warranted a downward departure from his mandatory life sentence in *State v. Thomas*, 50,898 (La.App. 2 Cir. 11/16/16), 209 So.3d 234. The second circuit found the sentence did not shock the sense of justice based on the brutality of the defendant's crimes and the extent of the victim's injuries.

On appeal, the defendant contends she "was not afforded an opportunity to show the sentencing court she was exceptional, and a victim of the legislature's failure to assign meaningful sentences." The defendant points out she is a first offender, a college student seeking a degree, and has three children. The transcript of the motion to reconsider the defendant's sentence does not indicate she was deprived of any opportunity to show she was exceptional. "[W]here the sentence is mandatory, the trial court need not justify its sentence using the factors iterated in La.Code Crim.P. art. 894.1." *State v. Sizemore*, 13-529, 13-530, p. 12 (La.App. 3 Cir. 12/18/13), 129 So.3d 860, 869, *writ denied*, 14-167 (La. 8/25/14), 147 So.3d 699.

The defendant has not shown a sufficient reason for this court to deviate from the mandatory life sentence for second degree murder, even though she is a first offender, student, and mother. This assignment of error lacks merit.

## CONCLUSION

The defendant's conviction and sentence are affirmed.

The trial court is directed to inform the defendant of the provisions of La.Code Crim.P. art. 930.8 by sending appropriate written notice to the defendant

41

within ten days of the rendition of the opinion and to file written proof in the record that the defendant received the notice. Additionally, the trial court is ordered to correct the court minutes of sentencing to reflect that the defendant's sentence is to be served at hard labor.

**AFFIRMED WITH INSTRUCTIONS.**