# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 17-403

**STATE OF LOUISIANA**

**VERSUS**

**JOSEPH MCKINLEY GUILLORY**
**AKA JOSEPH GUILLORY**

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
TWENTY-SEVENTH JUDICIAL DISTRICT COURT
PARISH OF ST. LANDRY, NO. 15-K-2178-C
HONORABLE ALONZO HARRIS, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

**JOHN E. CONERY**
**JUDGE**

\*\*\*\*\*\*\*\*\*\*

Court composed of John D. Saunders, John E. Conery, and D. Kent Savoie, Judges.

**AFFIRMED WITH INSTRUCTIONS.**

**Earl B. Taylor**
**District Attorney – 27th Judicial District Court**
**Jennifer M. Ardoin**
**Assistant District Attorney**
**Post Office Drawer 1968**
**Opelousas, Louisiana  70571**
**(337) 948-0551**
**COUNSEL FOR PLAINTIFF/APPELLEE:**
     **State of Louisiana**

**Douglas Lee Harville**
**Louisiana Appellate Project**
**Post Office Box 52988**
**Shreveport, Louisiana  71135**
**(318) 222-1700**
**COUNSEL FOR DEFENDANT/APPELLANT:**
     **Joseph McKinley Guillory**
     **AKA Joseph Guillory**

**CONERY, Judge.**

Defendant, Joseph McKinley Guillory, was charged by indictment filed on August 27, 2015, with the second degree murder of Haaymen Douresseau, Jr., a violation of La.R.S. 14:30.1. On November 29, 2016, a jury found Defendant guilty as charged.

A motion for new trial was filed on December 15, 2016. A hearing on the motion was held on March 16, 2017, and the trial court denied the motion. Defendant was then sentenced to life imprisonment, without the benefit of probation, parole, or suspension of sentence. The sentence is to run concurrently with any sentence Defendant is presently serving.

Defendant appealed and is now before this court asserting two assignments of error: 1) there was insufficient evidence to prove he was guilty beyond a reasonable doubt of second degree murder, and 2) the loss of exculpatory evidence denied his constitutional rights of confrontation and due process. For the following reasons, we affirm with instructions.

## FACTS AND PROCEDURAL HISTORY

On May 15, 2015, Defendant stabbed Haaymen Douresseau, Jr. on or near the sidewalk in front of Defendant's residence at Acadian Village Apartments. Mr. Douresseau died as a result of injuries from the stabbing. At trial, Defendant claimed that Mr. Douresseau was the aggressor and that the stabbing was justified because it was done in self-defense.

## ERRORS PATENT

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed for errors patent on the face of the record. After reviewing the record, we find that there are no errors patent; however, the court minutes of sentencing require

correction. The sentencing transcript indicates that Defendant's life sentence was imposed at hard labor, but this is not reflected in the court minutes of sentencing. "[W]hen the minutes and the transcript conflict, the transcript prevails." *State v. Wommack*, 00-137, p. 4 (La.App. 3 Cir. 6/7/00), 770 So.2d 365, 369, *writ denied*, 00-2051 (La. 9/21/01), 797 So.2d 62. Accordingly, we order the trial court to correct the sentencing minutes to accurately reflect that Defendant's sentence is to be served at hard labor without benefit of parole, probation, or suspension of sentence.

## ASSIGNMENT OF ERROR NUMBER ONE

In his first assignment of error, Defendant contends there was insufficient evidence to prove that he was guilty beyond a reasonable doubt of second degree murder. We will first discuss the standard of review.

> The standard of review in a sufficiency of the evidence claim is "whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found proof beyond a reasonable doubt of each of the essential elements of the crime charged." *State v. Leger*, 05-11, p. 91 (La. 7/10/06), 936 So.2d 108, 170, *cert. denied*, 549 U.S. 1221, 127 S.Ct. 1279, 167 L.Ed.2d 100 (2007) (citing *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), and *State v. Captville*, 448 So.2d 676 (La.1984)). The *Jackson* standard of review is now legislatively embodied in La.Code Crim.P. art. 821. It does not allow the appellate court "to substitute its own appreciation of the evidence for that of the fact-finder." *State v. Pigford*, 05-477, p. 6 (La. 2/22/06), 922 So.2d 517, 521 (citing *State v. Robertson*, 96-1048 (La. 10/4/96), 680 So.2d 1165, and *State v. Lubrano*, 563 So.2d 847 (La.1990)). The appellate court's function is not to assess the credibility of witnesses or to reweigh the evidence. *State v. Smith*, 94-3116 (La. 10/16/95), 661 So.2d 442.
>
> The factfinder's role is to weigh the credibility of witnesses. *State v. Ryan*, 07-504 (La.App. 3 Cir. 11/7/07), 969 So.2d 1268. Thus, other than insuring the sufficiency evaluation standard of *Jackson*, "the appellate court should not second-guess the credibility determination of the trier of fact," but rather, it should defer to the rational credibility and evidentiary determinations of the jury. *Id.* at

2

1270 (quoting *State v. Lambert*, 97-64, pp. 4-5 (La.App. 3 Cir. 9/30/98), 720 So.2d 724, 726–27). Our supreme court has stated:

> However, an appellate court may impinge on the fact finder's discretion and its role in determining the credibility of witnesses "only to the extent necessary to guarantee the fundamental due process of law." *State v. Mussall*, 523 So.2d 1305, 1310 (La.1988). In determining the sufficiency of the evidence supporting a conviction, an appellate court must preserve " 'the factfinder's role as weigher of the evidence' by reviewing 'all of the evidence . . . in the light most favorable to the prosecution.' " *McDaniel v. Brown*, 558 U.S. 120, 134, 130 S.Ct. 665, 674, 175 L.Ed.2d 582 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979)). When so viewed by an appellate court, the relevant question is whether, on the evidence presented at trial, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319, 99 S.Ct. at 2789.

*State v. Cofer*, 16-871 pp.3-4 (La.App. 3 Cir. 4/5/17), 216 So.3d 313, 316-17.

We will now review the law as it pertains to the crime charged, Defendant's claim of self-defense and his alternative claim that the responsive verdict of manslaughter is applicable.

> "Second degree murder is the killing of a human being" with the "specific intent to kill or to inflict great bodily harm[.]" La.R.S. 14:30.1(A)(1). "Specific criminal intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." La.R.S. 14:10(1). . . .
>
> > [I]n a case in which defendant asserts that he acted in self-defense, the state has the burden of establishing beyond a reasonable doubt that he did not act in self-defense. *State v. Brown*, 414 So.2d 726, 728 (La.1982). When defendant challenges the sufficiency of the evidence in such a case, the question becomes whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found beyond a reasonable doubt that the homicide was not committed in self-defense.

*State ex rel. D.P.B.*, 02-1742, p. 5 (La. 5/20/03), 846 So.2d 753, 756–57 (footnote omitted).

Louisiana Revised Statutes 14:20(A) states, in pertinent part:

A homicide is justifiable:
(1) When committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger.

. . . .

In *State v. Fox*, 15-692, p. 4 (La.App. 3 Cir. 2/3/16), 184 So.3d 886, 890, *writ denied*, 16–404 (La.3/13/17), [216] So.3d [800], this court stated:

"In examining a self-defense claim, it is necessary to consider: (1) whether the defendant reasonably believed that he was in imminent danger of death or great bodily harm; (2) whether the killing was necessary to prevent that death or great bodily harm; and (3) whether the defendant was the aggressor in the conflict." *State v. Mayes*, 14-683, pp. 2-3 (La.App. 3 Cir. 12/23/14), 154 So.3d 1257, 1259, *writs denied*, 15-178, 15-220 (La. 11/16/15), 184 So.3d 24. Additionally, in determining whether the defendant had a reasonable belief that the killing was necessary, it is appropriate to consider "the excitement and confusion of the situation, the possibility of using force or violence short of killing, and the defendant's knowledge of the assailant's bad character." *State v. Thomas*, 43,100, p. 5 (La.App. 2 Cir. 4/30/08), 981 So.2d 850, 854, *writ denied*, 08-1276 (La. 2/6/09), 999 So.2d 769.

"Manslaughter is [a] homicide which would be [first or second degree murder], but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection." La.R.S. 14:31(A)(1). " ' Sudden passion' and 'heat of blood' are not elements of the offense of manslaughter; rather they are factors which serve to mitigate murder to manslaughter." *State v. Vercher*, 14-1211, p. 10 (La.App. 3 Cir. 5/6/15), 162 So.3d 740, 746, *writ denied*, 15-1124 (La. 5/20/16), 191 So.3d 1065. The defendant must prove these mitigating factors by a preponderance of the evidence. *State v. Guillory*, 16-237 (La.App. 3 Cir. 11/2/16), 206 So.3d 1153.

*Cofer*, 216 So.3d at 316-18 (alterations in original).

4

## REVIEW OF THE EVIDENCE AT TRIAL

We will now apply the law to the evidence at trial.

Our review of the evidence begins with the testimony of Dr. Christopher Tape, who was accepted as an expert in medicine with a specialty in forensic pathology. Dr. Tape performed an autopsy on Mr. Douresseau on May 18, 2015. Dr. Tape testified there was a stab wound on Mr. Douresseau's left side under and slightly in front of the armpit, and a stab wound that went through the left arm. The wound to the side went into the chest cavity and down into the left lung. The depth of the stab wound to the chest was just under four inches. Dr. Tape testified that the wound to the arm was consistent with a defensive wound. Dr. Tape was further questioned about the wound to Mr. Douresseau's arm as follows:

Q. Could it be consistent with a wild left hand punch with the forearm being exposed with a stab occurring at the same time?

A. Perhaps.

Q. It could be, right?

A. Yes.

Q. So, then it's not necessarily defensive is it?

A. That's correct.

Q. So, there's no real sure way to say defensive? It just maybe [sic] indicative one way or the other?

A. That's why we use the language consistent.

Dr. Tape testified Mr. Douresseau's blood alcohol level was .15 percent. He also had a cocaine metabolite, benzoylecgonine, in his system. Evidence strongly suggested Mr. Douresseau consumed the cocaine first. However, Dr. Tape testified there was no way to determine when the cocaine was ingested.

Tobie Savoie, who had ten years of experience as Deputy Coroner for St. Landry Parish, examined Mr. Douresseau's body at the hospital on May 15, 2015 between 5:30 and 6:00 p.m. Mr. Savoie noted that Mr. Douresseau had lacerations to his left arm and left chest. Mr. Savoie did not see any weapons in Mr. Douresseau's possession, though he did not specifically check for weapons. Mr. Savoie testified that a death certificate was prepared by Dr. Pavich, the coroner. Mr. Savoie agreed with Dr. Pavich's findings that the stab wound to Mr. Douresseau's left chest was fatal, and the wound to his left forearm was a defensive wound.

Officer Corina Noblett testified that she was employed by the Eunice Police Department. She was on duty on May 15, 2015, and was dispatched to Acadian Village. Upon her arrival, she saw a black male laying on the ground and a black female, who was an off-duty registered nurse, doing chest compressions on the man. Officer Noblett took over chest compressions and was aided by Officer Mary Guillory.

Officer Noblett did not see any weapons in the surrounding area and did not check Mr. Douresseau's body for weapons. She subsequently secured the scene, as there were people in the crime scene area that had to be moved. According to Officer Noblett, none of the onlookers got close to Mr. Douresseau during the time chest compressions were being performed.

Officer Mary Guillory was employed by the Eunice Police Department on May 15, 2015, and rode with Officer Noblett to Acadian Village. Upon her arrival, Officer Guillory observed a male lying on the ground bleeding. Officer Noblett relieved a lady doing chest compressions, and people in the area around the man were "backed . . . off." Officer Guillory subsequently performed chest

6

compressions on the man. Neither she nor Officer Noblett removed anything from the area, and she did not observe any weapons.

Officer Guillory stated that a few people were still in the crime scene area after Mr. Douresseau was removed from the scene by emergency medical personnel but before crime scene tape was put up. After the ambulance left, Officer Guillory kept a crime scene log. Officer Guillory testified that all persons who entered the area after crime scene tape was put up were police officers.

Robin Willis was an EMT with St. Landry EMS. Upon his arrival at Acadian Village, he saw a black male lying on the ground. The man, later identified as Mr. Douresseau, was bleeding and CPR was being performed. The man was subsequently placed in an ambulance and transported to the Acadiana Medical Center. Mr. Willis did not observe any weapons when the man was moved from the scene. He did not search for weapons, but testified that if there had been a weapon in the area, he would have noted it. Mr. Willis reported "a lot" of people, which would have been more than three or four, were present at the scene when he arrived. This included a mix of civilians and police officers.

Kent Lavergne was employed by Acadiana Medical Center as a registered nurse in the emergency room (ER). He started an IV on Mr. Douresseau and helped physicians insert a chest tube. Mr. Lavergne testified that Mr. Douresseau's clothes were removed, placed in paper bags, and given to the Eunice Police Department. Mr. Lavergne testified that staff typically looked for items in clothing, and he did not find any weapons.

Shannon Martel was employed by the Acadiana Medical Center ER as a registered nurse. He triaged Mr. Douresseau and did not find any weapons on his

person. Mr. Martel indicated he normally looked for weapons on persons seeking treatment in the ER. However, a pat down would not have been conducted.

Renee Fuselier was employed by the Eunice Housing Authority. Ms. Fuselier testified that Naomi Dupree, Defendant's girlfriend, had executed a dwelling lease that was to include the names of all individuals who would live in an apartment with Ms. Dupree. Ms. Dupree did not list Defendant's name on that lease, and the lease was terminated after the events of May 15, 2015. Ms. Dupree's lease also specifically excluded the possession of weapons of any kind, including knives. Ms. Fuselier testified that she had seen Defendant on the premises in the past, but she did not know he resided at the apartment. Mr. Douresseau's mother also leased an apartment at Acadian Village, and Mr. Douresseau's name was not listed on her lease either. Ms. Fuselier stated, however, that neither Defendant nor Mr. Douresseau were forbidden from being on the premises.

Police contacted Ms. Fuselier about the events of May 15, 2015. She went with police to review video footage of the incident at the Housing Authority's security substation. The footage was located on a DVR. Police requested a copy of the footage. Ms. Fuselier did not know how to make a copy. Sergeant Nicholas Cooley used his cell phone to record the footage as it played. Ms. Fuselier was not contacted about the footage again until a week and a half before trial. The original DVR footage was not available at that time because the system automatically recorded over it two weeks to a month after the incident. All that was available was the recording of the video on Sergeant Cooley's cell phone.

Skylar Vidrine was the only eyewitness called to testify by the State. Ms. Vidrine was Defendant's first cousin and was at his girlfriend's apartment on May

15, 2015. She was standing by Defendant next to the apartment when she first noticed Mr. Douresseau walk "up to the sidewalk." Ms. Vidrine's sister and Defendant's children, who were playing on the sidewalk, were also present. Ms. Vidrine thought Ms. Dupree was standing by the apartment door at the time.

Ms. Vidrine assumed Mr. Douresseau was walking home when she saw him, as he lived two doors down from her at the apartment complex, and he was walking and talking to himself. The Defendant said something while the victim, Mr. Douresseau, was walking. Mr. Douresseau then stopped on the sidewalk and Defendant approached him. Ms. Vidrine then testified that Defendant asked Mr. Douresseau who he was talking to. Mr. Douresseau responded, but Ms. Vidrine did not recall what he said. She testified that she had trouble understanding Mr. Douresseau in the past. Mr. Douresseau continued to stand on the sidewalk and, according to Ms. Vidrine, he did not approach the Defendant.

Ms. Vidrine was questioned about what occurred as follows:

Q. Okay. Uh, Haaymen Douresseau said something back. You didn't understand correct?

A. Yes, sir.

. . . .

Q. How far do you recall Mr. Joseph Guillory going towards Mr. Douresseau?

. . . .

Q. Okay. Did he go, did he go passed [sic] the middle sidewalk?

A. No. He… (inaudible). It was, it was between that middle sidewalk and that, his sidewalk by his apartment. He was right there.

Q. So, it would be, it would be considered his yard?

A. Yeah.

9

Q.     Okay.  If the, near the bicycle, where the bicycle was on the corner?

A.     No response recorded.

Ms. Vidrine was further questioned as follows:

Q.     And when Joseph Guillory approached Haaymen Douresseau, did you see what Haaymen Douresseau did?

A.     I don't remember.

Q,     Did you watch your video this morning?

A.     Yeah.

Q.     Do you recall saying to the officer at the time that Haaymen Douresseau put his arms like this?

A.     Yeah.

Q.     Is that what, is that what you saw?

A.     Yeah.

Q.     Did he have anything in his hands?

A.     I don't remember.  I don't think so.

Q.     You don't think so.  He just put his arms up?  I think you did like right?

A.     Yeah.  Because they….

Q.     Let me, let me just do something for the record. I'm holding up my right left arm, it doesn't make any difference, probably with my fist even with my forehead crossed. Is that correct?

A.     Yeah.

Ms. Vidrine was then asked, "And you said the first thing you saw Haaymen Douresseau do was put his hand up in defense of?"  Ms. Vidrine responded, "Yes, sir."  She was asked if Mr. Douresseau "crossed his arms."  She indicated it was "something like that."  Ms. Vidrine stated that Mr. Douresseau swung back "like, like it was a fight."  Ms. Vidrine's demonstration of Mr. Douresseau's hands was

described by the State as "up about even with her forehead and the wrist, that crosses the wrist with her hands pointing up." She did not see Mr. Douresseau's hands in his pockets.

Ms. Vidrine believed Defendant struck the first blow. She saw Defendant strike Mr. Douresseau once and saw blood on Mr. Douresseau's arm. Ms. Vidrine did not see anything in Defendant's hand until after the fight. Ms. Vidrine felt that Mr. Douresseau tried to make it to his apartment, but he fell down. Defendant walked away after he struck Mr. Douresseau, and Ms. Dupree brought Defendant into her apartment before Mr. Douresseau fell down. Ms. Vidrine saw a knife in Defendant's hand as he returned to the apartment.

Ms. Vidrine was questioned regarding weapons in Mr. Douresseau's possession as follows:

Q. Did you see any weapons around him at the time when he fell down?

A. No, sir.

Q. Did you see him drop any weapon from the timer [sic] after he disengaged until he fell down?

A. No, sir. I wasn't close enough to see if he had anything.

Q. Well, how far do you think you were from Joseph and Haaymen when they were fighting? What I'm going to do is I'm going to start next to you and I'm going to back up and when you think I've gotten far enough you tell me about how far you were from them?

. . . .

Q. Here?

A. Yeah. Because it's like a sidewalk. I was standing next to the apartment. t's a sidewalk and then it's another sidewalk across. They was [sic] between those two sidewalks.

11

Q.     Alright.  I'm going to ask Ms. Uh, I'm going to give it to her. Let the record show that I'm giving her a tape measure.  Would you tell us what it reads from me to you?
A.     Eleven.

Sergeant Cooley was employed by the Eunice Police Department and viewed the security footage at the Housing Authority.  He recorded the footage with his cell phone because the person he viewed the video with was unable to give him a copy.[1]  He returned later, but the original footage had been deleted.

The cell phone video was played for the jury.  Sergeant Cooley indicated that the person on the video in white pants and a dark shirt was Defendant, and Mr. Douresseau was the person who got out of the car.  Sergeant Cooley testified regarding the video as follows:

Q.     As we look at he [sic] frame right now at 4:27 uh, is that white car that pulled in that Haaymen Douresseau was a passenger in?

A.     Yes.

Q.     Okay. It's pulling in the parking lot?

. . . . .

A.     It's on the road.

. . . .

Q.     Who is that person that just got out of that white car?

A.     That's Haaymen Douresseau.

. . . .

Q.     Let me ask you Detective, Sgt. Cooley, based on the frame that's in front of you, .01 does Mr. Mr. Douresseau appear to have his hands lifted upward in the air?

. . . .

_____

[1]It is unclear whether this occurred on May 15 or 18, 2015.

A.    Yes.

       . . . .

Q.    At a point uh, at 00.28, 28 seconds where do you observe on the tape Mr. Douresseau made a U turn on the sidewalk to go between apartments?

A.    He turned on the sidewalk and goes in between the apartments.

Q.    Is he walking on the sidewalk?

A.    It appears.

Q.    It doesn't appear that he's wondering [sic] in the grass does it?

A.    No.

Q.    Did he just go through persons that are on the sidewalk?

A.    He looks like he moved around some one [sic].

Q.    .038 had he stopped yet in front of Mr. Guillory's residence?

A.    No.

Q.    At .039 has he stopped yet?

A.    No.

Q.    [.]040 has he stopped yet?

A.    No.

Q.    [.]042 has he stopped yet?

A.    Yes.

The questioning continued as follows:

Q.    Okay. The darker colored clothing who is, who do you identify that as being?

A.    I identify that as Joseph Guillory.

Q.    And the sidewalk that he's coming off of or that entrance is that to his home?

A.    Yes.

13

Q. Mr. Douresseau is still in the same spot?

A. Yes.

Sergeant Cooley did not believe either party pursued the other after the altercation. He indicated that Defendant came from his porch, and he did not observe any evidence that led him to believe Mr. Douresseau was the aggressor. When executing a search warrant at Ms. Dupree's residence on the date of the offense, Sergeant Cooley found a knife with blood on it in a dresser.

Carolyn Booker was an employee of the Acadiana Criminalistics Laboratory and was accepted as an expert in the field of forensic science with a specialty in DNA analysis. The DNA profile from the blood on the blade of the knife recovered by police was that of Mr. Douresseau. The handle of the knife bore a mixed DNA profile, and Mr. Douresseau was one of the contributors. The other contributor was unknown. However, Ms. Booker did not have a sample of Defendant's blood for comparison.

The layout of the Housing Authority was depicted in State's Exhibit 8. Sergeant Cooley indicated that Mr. Douresseau's residence was labeled "Res," and the star indicated where Mr. Douresseau stopped. Defense Exhibit 2, a diagram of the area, depicted a blood trail from the location where Mr. Douresseau was stabbed to the spot where he fell down. A "1" on the drawing indicated where the fight started, and Mr. Douresseau's final resting place was marked with a "2." Blood was found by the bicycle on the sidewalk. Part of that bicycle was on the sidewalk and part was in the yard. Sergeant Cooley felt the stabbing occurred in that area. Sergeant Cooley further indicated the blood was evidence that Mr.

14

Douresseau was in the grassy part of the yard. Sergeant Cooley thought Mr. Douresseau collapsed about even with apartment 515A.

Jude Moreau was the Executive Director of the St. Landry Parish Communications District. He was the custodian of the recorded 911 calls made in this matter. The first 911 call was received on Friday, May 15, 2015, at 4:36 p.m. That call was made by Defendant, who said there was an emergency, and someone had been stabbed at Acadian Village apartment 515B on Fuselier Street. Defendant then said he stabbed Mr. Douresseau in the arm. The call ended at 4:38 p.m. An unknown female placed the second call to 911. A third call was made by the victim's sister, Veronica Williams, at 4:40 p.m. The fourth call to 911 was an inquiry regarding the failure of an ambulance to arrive.

Defendant called a single witness to testify, Naomi Dupree, who was Defendant's girlfriend. At the time of trial, the two had been together for twelve years and had three children together. On May 15, 2015, the family resided at 515B Fuselier Street. Ms. Dupree testified that Defendant had permission to reside there on his time off. However, he was not listed on her lease. Ms. Dupree knew Mr. Douresseau because he was "always around the house and stuff." Mr. Douresseau was "[a]round the neighborhood" and knocked on the door for cigarettes and rides.

On the date at issue, Ms. Dupree's three children and Skylar Vidrine and her little sister, Jasmine Vidrine, were also at the residence. Ms. Dupree and Defendant were sitting on the porch, and the children were playing in the yard at a distance, but they could be seen.

Ms. Dupree described Mr. Douresseau's arrival at the complex as follows:

A. I recall him arriving at the complex like out of hand. Like...

15

Q.     Okay.  How did he get to the complex if you remember?

A.     I think it was [sic] white Camry.

Q.     Okay.  Was he driving or?

A.     He got dropped off.

Q.     Okay.  You said, "out of hand." What you mean [sic] by, "out of hand?"

A.     Like something like I never seen [sic] him before.  Like just got out the [sic] car, threw his hands up like WTF.  Like just going off.

Q.     Going off on anyone in particular or?

A.     No.

Q.     Okay.  Was he just kind of wondering [sic] around or did he have a direction?

A     Like whenever he got out the [sic], out the [sic] car, it was like he was going to his mother [sic] house.  But then it was like he seen [sic] us on the porch then he turned around.

Q.     Okay.  So, did he come up the sidewalk?

A.     No response recorded.

Ms. Dupree had never seen Mr. Douresseau act that way before.  She testified she was fearful of Mr. Douresseau at the time, fearful for her life and for her children.  He was not the same person he was on any other day.  Ms. Dupree could not see if Mr. Douresseau had anything in his hands when he arrived, and she was not sure if he ever took anything out of his pockets.  She did not see anyone pick up a knife or weapon after Mr. Douresseau fell.  Additionally, Ms. Dupree was not sure Defendant had a knife in his hand when he left the porch.  She later stated she did not see a knife in Defendant's hand.

Ms. Dupree indicated Mr. Douresseau passed the apartment and came back.  Ms. Dupree then stated that Mr. Douresseau came into her yard, which was a

16

grassy area and not the sidewalk. Mr. Douresseau was "going off" then. As Mr. Douresseau was "coming," Ms. Dupree and Defendant were still talking. Ms. Dupree then testified that Mr. Douresseau "walked up to us, with a hand in his pocket." She did not recall if Defendant spoke to Mr. Douresseau at that time. Defendant got up and asked Mr. Douresseau what was wrong. Mr. Douresseau then swung, and Defendant stepped back. Ms. Dupree testified that Mr. Douresseau swung twice at Defendant before Defendant swung at Mr. Douresseau.

When asked where the altercation took place, Ms. Dupree stated, "by the sidewalk in the grass." She was then asked if the altercation occurred in the middle of her yard and replied, "Yes, sir." She never saw Defendant leave what she considered to be her yard. After the altercation, Defendant did not pursue Mr. Douresseau, and he called 911.

The questioning of Dupree continued as follows:

Q. While Joseph was stabbing Haaymen Douresseau did you ever see a weapon in Haaymen Douresseau's hand?

A. I'm not sure. No, sir.

Q. Did you ever see a weapon in Haaymen Douresseau's hand at anytime before, during or after he was stabbed.

A. No, sir.

Q. Did Haaymen Douresseau ever say anything to you?

A. That day?

Q. That day? What is, just before he stabbed him?

A. To me he was saying it to everybody, like us and the kids.

Q. And do you remember what he was saying?

A. He was saying bad words, cursing.

Q. He was cursing?

17

A.      Disrespecting like...

Q.      Listen.  Everybody in here looks like they're over eighteen. So, you tell us the words you recall?

A.      "Shut the F[---] up".  All kind of things and the kids was [sic] right there.

Q.      Alright. So, that was all he said?

A.      No response recorded.

Q.      Did he ever say I'm going to hurt anybody?

A.      I didn't hear him say that.

        . . . .

Q.      Did he ever threaten anybody that you heard?

A.      No, sir.

Q.      But why were you scared if he didn't threatened [sic] anybody?

A.      Because I never seen [sic] him act the way that he acted that day. Like he wasn't his self [sic] at all.

Q.      I understand.  But he didn't threaten anybody? You just said that.

A.      But the way he was acted [sic] you never know.

        . . . .

Q.      Okay.  So, if you said that, he Haaymen threw the first, swung the first blow?

A.      He swung twice.

Q.      He swung twice.  And that's when Joseph, you don't know if he had a knife?  You didn't see how many times Joseph swung, swung?

A.      No, sir.

Q.      Not at all?

A.      All I seen [sic] the first swung [sic]. That's it.

18

Q. And you're saying it's Haaymen that did the first swing?

A. I said all I seen [sic] was Joseph swing one time.

Q. Okay. Did you see Haaymen put his hands like this?

A. No sir.

Q. You never saw that?

A. No response recorded.

Q. Do you know how he got a cut in his left arm that went all the way through the muscle of his arm, of his forearm? You know how Haaymen got a cut like that?

A. No.

Q. You know how Haaymen got a cut that went four inches into his lungs?

A. No, sir.

When asked if Mr. Douresseau attacked Defendant before Defendant fought back, Ms. Dupree replied, "That day he swung twice. Yes, sir." She informed police that Mr. Douresseau's hand was in his pocket.

Ms. Dupree agreed that more than ten or twenty onlookers gathered around Mr. Douresseau after the altercation. She indicated that it took police twenty to twenty-five minutes to arrive, and Mr. Douresseau was moved during that time. Ms. Dupree testified that Defendant called 911 right away. She was questioned about the 911 call occurring at 4:27 and police arriving at 4:31, which was not twenty to thirty minutes after the altercation. She responded that police tape was not put up right away.

The surveillance video was played for Ms. Dupree. She indicated the sidewalk in front of her apartment ran back to the home of Mr. Douresseau's mother. Ms. Dupree was asked the following: "Do you recall at any point and

19

time that Joseph Guillory walked up and threatened or do anything of the sort?" She replied, "No, sir."

Ms. Dupree indicated the knife found in her apartment belonged to Defendant.

The State called one witness on rebuttal. Officer Lavon Edwards was employed by the Eunice Police Department. On May 15, 2015, she was dispatching. Officer Edwards testified that the call regarding the incident was received at 4:27, and people were dispatched at 4:29. Sergeant Rickey Romero arrived at 4:31, Officer Noblett at 4:32, Officer Guillory at 4:36, Deputy Chief Varden Guillory at 4:37, Detective Brickley at 4:46, Sergeant A.J. Frank at 4:46, and Detective Stephanie Myers at 4:46.

The video depicts Mr. Douresseau arriving at the complex by car and walking down a sidewalk, which several people were on or very near. Mr. Douresseau passed the portion of the sidewalk that branched off to Defendant's apartment and then turned back. Defendant entered the screen from the front of his apartment and walked up the sidewalk toward Mr. Douresseau. There was some type of altercation between Mr. Douresseau and Defendant. However, it is extremely difficult to determine what occurred between the two because the altercation occurred where "CH4" is positioned on the screen. It is difficult to determine from the video who threw the first blow, but it appeared that Mr. Douresseau did hit Defendant. After the altercation, Defendant walked back down the sidewalk to his apartment, and Mr. Douresseau walked backwards toward the parking lot and onto the grass. Mr. Douresseau then walked in the direction of his apartment and out of view.

Defendant contends the evidence was insufficient to negate Ms. Dupree's testimony that he acted in self-defense. Defendant argues that Mr. Douresseau, who was belligerent, cursing, high on cocaine, and drunk, passed Defendant's home and then turned around and entered his yard. Defendant's counsel in brief argues that the video and testimony by Ms. Dupree at trial shows that:

> Mr. Douresseau was coming at Ms. Dupree, [Defendant], and their family, Mr. Douresseau "was just going off," Mr. Douresseau "walked up" to them as they were "just sitting down talking," and had his hand in his pocket. Ms. Dupree "was fearful for . . . [her] life and also . . . [her] kids."
>
> As Mr. Mr. Douresseau approached [Defendant's] family, [Defendant] stood up and "asked . . . [Mr. Douresseau] what was wrong." Mr. Douresseau, then, swung at [Defendant] who stepped back. After Mr. Douresseau swung twice more, [Defendant] swung twice, fatally stabbing Mr. Douresseau.

In the alternative, Defendant contends that while in sudden passion or heat of blood caused by conditions created by Mr. Douresseau, he did what an average person would have done, lose his self-control and cool reflection and lash out violently to protect his family from a belligerent, cursing man who was high on cocaine, drunk, and approaching his family while possibly armed. Accordingly, Defendant argues in the alternative that the jury should have found him guilty of manslaughter.

The State avers it is abundantly clear from the video and evidence at trial that Defendant approached Mr. Douresseau, Mr. Douresseau did not have a weapon, and Mr. Douresseau did not threaten Defendant. The State contends there was no testimony presented that indicated Defendant acted in self-defense. The State additionally argues that, even if Defendant felt threatened, his stabbing Mr. Douresseau, who was unarmed, was not reasonably necessary, as he certainly could have used force short of killing. There was no evidence of bad character

presented. Furthermore, there was no evidence that Defendant reasonably believed he was in imminent danger of death or great bodily harm.

*Self-defense*

As previously noted, it is necessary to consider the following when examining a claim of self-defense: 1) whether Defendant reasonably believed he was in imminent danger of death or great bodily harm, 2) whether the killing was necessary to prevent death or great bodily harm, and 3) whether Defendant was the aggressor in the conflict. The State had the burden of disproving Defendant's justification defense.

The standard set forth in La.R.S. 14:20 is whether Defendant's subjective belief was that he was in imminent danger of losing his life or receiving great bodily harm and that the killing was necessary to save himself and was reasonable. The determination of reasonableness is based on the facts of the case. *See State v. Brown*, 93-1471 (La.App. 3 Cir. 5/4/94), 640 So.2d 488. Factors to consider in determining whether Defendant had a reasonable belief that the killing was necessary are the excitement and confusion of the situation, the possibility of using force or violence short of killing, and Defendant's knowledge of the assailant's bad character. *State v. Spivey*, 38,243 (La.App. 2 Cir. 5/12/04), 874 So.2d 352. "In cases where the defendant claims self-defense as a justification, the absence of a weapon from the victim's person or immediate reach is often a critical element of the state's proof. The absence of weapon on the victim, however, is not dispositive of the issue." *State v. Griffin*, 06-543, p. 9 (La.App. 3 Cir. 9/27/06), 940 So.2d 845, 851, *writ denied*, 07-02 (La. 9/14/07), 963 So.2d 995 (citation omitted).

In *State v. Graham*, 420 So.2d 1126 (La.1982), the victim had an argument with the defendant's brother in the door of a nightclub. The defendant joined the

22

argument, first merely having words with the victim. The argument subsequently escalated to an exchange of punches between the victim and the defendant. At that time, the defendant's brother was no longer involved. The defendant was "struck down" at least twice and, upon arising the second time, got up swinging a knife. *Id.*at 1127. The defendant stabbed the victim, who subsequently died. The defendant argued the evidence was insufficient to convict him of second degree murder. The supreme court found:

> The evidence does not show defendant in danger of great bodily harm himself nor of passionately stepping into the fray to defend his brother. What the evidence does show is defendant joining the argument as an aggressor, stabbing the decedent and defendant's prior record of other convictions of assault, battery and other violence. We think it quite reasonable for the jury to infer from the circumstances the guilt of defendant.
>
> . . . .
>
> The evidence also shows that defendant swung at and stabbed the decedent with a knife, who had not, during the argument, attacked defendant with any weapon. A rational trier of fact could have found, beyond a reasonable doubt, that based on this evidence, the defendant did not kill the victim in self defense, but rather in a manner sufficient to constitute second degree murder. The evidence further shows defendant interfered in a purely vocal quarrel between decedent and defendant's brother. There was no cause for defendant to interfere. He became the aggressor and ultimately asked for the beating he received at the hands of the victim. By pulling a knife and slashing the decedent, defendant dramatically escalated the seriousness of the incident to the point of no return. It is reasonable for the jury to conclude that there was no evidence in the record to show that defendant had drawn the knife in the "heat of blood." Moreover, we think the jury properly found that defendant had formed the requisite specific intent when he drew the knife, and this may be inferred from the overwhelming evidence. *State v. McDermitt*, 406 So.2d 195, 202 (La.1981).

*Id.* at 1127-28.

In *State v. Mincey*, 08-1315 (La.App. 3 Cir. 6/3/09), 14 So.3d 613, the victim was at a nightclub when he became involved in a verbal altercation with the

23

defendant. The defendant subsequently shot the victim after the victim attempted to punch him. On appeal, the defendant argued that the state failed to disprove that he acted in self-defense. This court held, in pertinent part:

> The essence of his defense is that he was justified in responding to an attempted punch by shooting his opponent in the chest at close range. We recognize that Dejean had two friends with him. Thus, Defendant may have genuinely felt endangered; further, some level of fear was objectively reasonable. However, the level of force he used to defend himself was far beyond what was necessary under the circumstances.

*Id.* at 615. *See also State v. Mayes*, 14-683 (La.App. 3 Cir. 12/23/14), 154 So.3d 1257, *writs denied*, 15-178, 15-220 (La. 11/16/15), 184 So.3d 24.

Testimony presented by Defendant in this case indicated that Mr. Douresseau may have been acting out of character in that he was talking to himself, and he said "[s]hut the f--- up" in front of Defendant, his girlfriend, and their children. Ms. Dupree testified that she was afraid of Mr. Douresseau, but he never threatened anyone. She further testified that Mr. Douresseau had his hands in his pockets. However, she never saw a weapon. Ms. Vidrine testified that Defendant approached Mr. Douresseau and threw the first punch. Mr. Douresseau put his hands up in a defensive manner. The video of the incident reveals Mr. Douresseau standing on the sidewalk and Defendant coming from the area of his apartment and approaching Mr. Douresseau on or very near the sidewalk.

We find that the evidence indicates Defendant's alleged subjective belief that he was in imminent danger of losing his life or receiving great bodily harm was not reasonable. First and foremost, Defendant approached Mr. Douresseau. Additionally, if Mr. Douresseau struck Defendant first, as claimed by Ms. Dupree, responding to an oncoming punch by stabbing that person is an excessive response. Furthermore, there was no evidence at trial of Mr. Douresseau's bad character.

Louisiana Revised Statutes 14:21 discusses the aggressor doctrine as follows: "A person who is the aggressor or who brings on a difficulty cannot claim the right of self-defense unless he withdraws from the conflict in good faith and in such a manner that his adversary knows or should know that he desires to withdraw and discontinue the conflict."

Both Ms. Dupree and Ms. Vidrine testified that Defendant left the front of his apartment and approached Mr. Douresseau, which is supported by the video. Furthermore, Ms. Vidrine testified that Defendant struck Mr. Douresseau first. Though Ms. Dupree said that Mr. Douresseau struck the first blow, based on Ms. Vidrine's testimony and considering all the evidence, the jury had ample evidence with which to conclude that Defendant was the aggressor and could not claim self-defense. *See Graham*, 420 So.2d 1126.

We find that the facts of the case demonstrate that Defendant's actions exceeded the level of force reasonably and apparently necessary to defend himself or others against an unarmed man. Accordingly, we find that the State presented sufficient evidence to disprove Defendant's claim of self-defense.

### Second Degree Murder

We now look to whether there was sufficient evidence to support Defendant's conviction of second degree murder.

> Specific intent to kill can be inferred from the intentional use of a deadly weapon such as a knife or a gun. *State v. Knight*, 09–359, p. 14 (La.App. 5 Cir. 2/9/10), 34 So.3d 307, 317, *writ denied*, 10–2444 (La.10/21/11), 73 So.3d 376. Specific intent to kill may be inferred from the extent and severity of the victim's injuries. *State v. Stacker*, 02–768 (La.App. 5 Cir. 12/30/02), 836 So.2d 601, 606, *writ denied*, 03–0411 (La. 10/10/03), 855 So.2d 327.

*State v. Thibodeaux*, 15-723, p. 9 (La.App. 3 Cir. 4/13/16), 190 So.3d 426, 433, *writ denied*, 16-844 (La. 4/24/17), 220 So.3d 741 (quoting *State v. Riley*, 11-673, p.

11 (La.App. 5 Cir. 3/13/12), 90 So.3d 1144, 1150, *writ denied*, 12-855 (La. 9/28/12), 98 So.3d 828).

Defendant stabbed an unarmed man under the arm with a knife, puncturing his lung. Based on all of the evidence presented, viewed, as we must, in the light most favorable to the prosecution, we agree that the State proved beyond a reasonable doubt that Defendant had the specific intent to kill or inflict great bodily harm upon Mr. Douresseau. *See State v. Strother*, 09-2357 (La. 10/22/10), 49 So.3d 372. Thus, we find that Defendant's Assignment of Error Number One, insufficient evidence to convict Defendant of second degree murder, is without merit.

*Manslaughter*

The Defendant argues in the alternative that the jury should have returned a responsive verdict of manslaughter. To be entitled to a responsive verdict of manslaughter, Defendant was required to prove the mitigating factors of sudden passion and heat of blood by a preponderance of the evidence. *Cofer*, 216 So.3d 313. "[T]here is no requirement that the factors be affirmatively established by the defendant. Instead, the jury is free to infer the mitigating circumstances from the evidence." *State v. Lindsey*, 98-1064, p. 5 (La.App. 4 Cir. 6/3/98), 715 So.2d 544, 547.

> Generally, arguments do not suffice to reduce a murder to manslaughter. *State v. Miller*, 98–642 (La.App. 3 Cir. 10/28/98), 720 So.2d 829, *writ denied,* 98–3119 (La.5/14/99), 741 So.2d 659. Additionally, . . . "[m]ere words or gestures, however offensive or insulting, will not reduce homicide from murder to manslaughter." *State v. Mitchell*, 39,202, p. 12 (La.App. 2 Cir. 12/15/04), 889 So.2d 1257, 1263, *writ denied*, 05–132 (La.4/29/05), 901 So.2d 1063.

*State v. Watson*, 15-392, p. 12 (La.App. 3 Cir. 10/7/15), 175 So.3d 1192, 1200-01, *writ denied*, 15-2046 (La. 11/7/16), 208 So.3d 897.

In *State v. Bell*, 442 So.2d 715, (La.App. 1 Cir. 1983), *writ denied*, 444 So.2d 1244 (La.1984), the defendant was convicted of second degree murder. While the defendant and the victim were visiting the home of a friend, the victim said, "'I better get the hell out of here before some stuff starts,'" or something to that effect. The victim then struck the defendant with his fist. A fight ensued, and the victim was stabbed multiple times with a knife having a twelve-inch blade. On appeal, the defendant argued the most serious crime committed was manslaughter. The first circuit held:

> We find no provocation sufficient to deprive an average person of his self-control. An extremely intoxicated and not visibly armed man struck defendant, using only his fist. There was no evidence of previous "bad blood," threats, or any other circumstances that would increase the significance of the simple act of striking. We cannot conclude an average person would be so inflamed by the strike as to lose his self control and cool reflection in the way this defendant did.

*Id.* at 718.

In *State v. Bratton*, 49,434 (La.App. 2 Cir. 1/14/15), 161 So.3d 937, *writ denied*, 15-303 (La. 11/20/15), 180 So.3d 317, the defendant argued the evidence supported a conviction of manslaughter rather than second degree murder. The second circuit addressed the issue, stating:

> In his statement to police, Bratton said that Hammett "said something stupid" to him, but he testified at trial that he was upset over something that Hammett had said to Veronica. None of this vague and conflicting evidence supplies proof that an average person would have been reasonably provoked to lethal violence.

*Id.* at 944.

In *State v. Gauthier*, 546 So.2d 652, 654 (La.App. 4 Cir. 1989), the fourth circuit stated: "Even assuming that defendant's allegations are true that Lee cursed at him at the dance and when telling him to move out of the way of the car, these

actions are certainly not the type of provocation which would justify shooting someone."

In *State v. Shanks*, 97-1885 (La.App. 1 Cir. 6/29/98), 715 So.2d 157, the victim went to the defendant's home to collect money the defendant owed him for a prior purchase of marijuana. Once inside the defendant's home, the victim began demanding money and an argument ensued. The victim struck the defendant once on the left side of the cheek and once on the left side of the neck. As the victim turned to walk out the door, the defendant picked up a shotgun and fired one time at waist level. During his statement to police, the defendant stated, "'[N]o mother f------ is going to come in my house and hit me.'" *Id.* at 162. On appeal, the defendant argued that the evidence was insufficient to prove second degree murder. Alternatively, the defendant argued that the court should find that the evidence supported a conviction of manslaughter. The court concluded the following:

> It is obvious the majority of the jury concluded this homicide was not committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection; or that, if there was such provocation, defendant's blood had actually cooled, or an average person's blood would have cooled, at the time the offense was committed.

*Id.*

In this case, the jury had ample evidence with which to conclude that cursing in front of Defendant's children, insulting Defendant, and possibly even hitting Defendant (if Ms. Dupree were to be believed) were not sufficient provocation to deprive an average person of his self-control and cool reflection. We find that viewing the evidence in the light most favorable to the State, any rational trier of fact could have found that the mitigating factors were not established by a

28

preponderance of the evidence and that there was proof, beyond a reasonable doubt and to the exclusion of any reasonable hypothesis of innocence, that Defendant committed second degree murder. Therefore, we find this assignment of error lacks merit.

## ASSIGNMENT OF ERROR NUMBER TWO

In his second assignment of error, Defendant contends the loss of what he claims to be "exculpatory evidence," the original tape of the confrontation from the apartment complex video, denied him his constitutional rights of confrontation and due process.

Defendant argues the State failed to preserve the exculpatory digital surveillance footage of the incident. He claims that the cell phone video of the footage was extremely hard to see, and the cell phone video did not allow the jury to view critical moments of the incident. Defendant contends he was denied use of the surveillance footage evidence due solely to the carelessness of the State. He claims the evidence presented did not exclude the reasonable possibility that he acted in self-defense or committed manslaughter, and the surveillance footage would have shown he did.

Defendant further contends that even if the evidence was not exculpatory, there are due process implications in the destruction of pertinent evidence prior to trial. He argues the State and the police department must be held accountable and must operate well enough to maintain custody of critical evidence. He claims the loss of the digital recording in this case was not the result of good-faith adherence to standard police procedures. Thus, the State should have been precluded from proceeding to trial.

Defendant failed to object to the admission of the cell phone video of the Acadian Village security footage, State's Exhibit 6, or to it being played for the jury.[2] That failure precludes Defendant from raising this issue on appeal. *See* La.Code Evid. art. 841. Accordingly, we decline to address the merits of this assignment of error.

## CONCLUSION

Defendant's conviction and sentence are affirmed. The trial court is ordered to correct the sentencing minutes to accurately reflect that Defendant's sentence is to be served at hard labor without benefit of parole, probation, or suspension of sentence.

**AFFIRMED WITH INSTRUCTIONS.**

---

[2]The issue was raised in Defendant's motion for new trial. However, he has not asked this court to consider the trial court's denial of that motion.